

STEVEN H. FELDERSTEIN (State Bar No. 056978)
PAUL J. PASCUZZI (State Bar No. 148810)
JENNIFER E. NIEMANN (State Bar No. 142151)
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
sfelderstein@ffwplaw.com
ppascuzzi@ffwplaw.com
jniemann@ffwplaw.com

Attorneys for The Roman Catholic Bishop of Stockton

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF STOCKTON, a corporation sole,<br><br>                Debtor-In-Possession. | CASE NO. 14-20371<br><br>Chapter 11<br><br>**DEBTOR'S DISCLOSURE STATEMENT REGARDING PLAN OF REORGANIZATION DATED OCTOBER 26, 2016**<br><br>Confirmation Hearing:<br><br>Hearing Date:   December 20, 2016<br>Hearing Time:   1:30 p.m.<br>Courtroom:       35<br>                    501 I Street, 6th Floor<br>                    Sacramento, CA |

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE § 1125. IF YOU HAVE REQUESTED AND RECEIVED A COPY OF THE DISCLOSURE STATEMENT IN CONNECTION WITH THE COURT'S HEARING TO CONSIDER APPROVAL OF THE DISCLOSURE STATEMENT, NOTHING CONTAINED HEREIN IS OR WILL BE DEEMED A SOLICITATION OF ACCEPTANCE OF THE PLAN OF REORGANIZATION FILED BY THE DEBTOR.**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     OVERVIEW OF THE PLAN .................................................................3

III.    STATEMENTS REGARDING REPRESENTATIONS ........................6

        A.      Definitions and Plan Supremacy ...............................................6

        B.      Limited Representation ..............................................................6

        C.      Voting Procedures .....................................................................8

IV.     THE DEBTOR AND ITS OPERATIONS ...........................................10

        A.      The Diocese of Stockton .........................................................10

        B.      Legal Structure of the RCB and Parishes and other Non-Debtor Catholic Entities .................................................................................11

        C.      The Clergy Sexual Abuse Crisis and RCB Response .............13

        D.      Need for Reorganization ..........................................................16

V.      THE DEBTOR'S ASSETS AND LIABILITIES ................................16

        A.      Assets .......................................................................................16

                1.      Real Property ...............................................................16

                2.      Personal Property ........................................................17

                3.      Insurance .....................................................................17

                4.      Restricted Assets .........................................................18

                5.      Avoidance Actions ......................................................18

        B.      Liabilities .................................................................................19

                1.      Priority Claims and Accrued Employee Leave ...........19

                2.      Trade Debt ...................................................................19

                3.      Claim of F & M Bank ..................................................19

                4.      Claims of Undersecured Creditors ..............................19

                5.      Claim of RCW ..............................................................20

                6.      Claim of Madonna of Peace Retreat Center ................20

                7.      Priest Retirement Claims .............................................20

                8.      Tort Claims ..................................................................20

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

VI.    SIGNIFICANT EVENTS IN CHAPTER 11 ...................................................20

       A.    Retention of Debtor's Professionals ...........................................20

       B.    Appointment of Creditors' Committee .......................................21

       C.    Stipulations .................................................................................21

       D.    Future Claims Representative .....................................................22

       E.    Sale of Eucharistic Sisters' Residence .......................................22

       F.    Bar Dates .....................................................................................22

       G.    Plan Exclusivity ..........................................................................22

       H.    Appointment of Post-Petition Mediator .....................................23

VII.   SUMMARY OF PLAN OF REORGANIZATION ...................................23

       A.    Overview of Chapter 11 ..............................................................23

       B.    Contributions to the Plan ............................................................26

             1.    Insurance Settlement Agreement .....................................26

             2.    Participating Party Settlements .......................................29

       C.    Effective Date..............................................................................30

       D.    Specification and Treatment of Unclassified Claims...................31

             1.    Administrative Claims (other than Professional Fee Claims)................................31

             2.    Professional Fee Claims................................................32

             3.    Priority Unsecured Claims................................................33

             4.    Priority Tax Claims................................................33

       E.    Treatment of Classified Claims................................................33

             1.    Class 1 – Priority Employee Unsecured Claims ...................33

             2.    Class 2 – Prepetition Date Secured Tax Claims.....................34

             3.    Class 3 – Pastoral Center Lender Secured Claims.....................35

             4.    Class 4 – Non-Priority Employee Claims .....................35

             5.    Class 5 – General Unsecured Convenience Claims ...................36

             6.    Class 6 – General Unsecured Claims ................................37

             7.    Class 7 – Claim of F & M Bank................................37

8.      Class 8 – Claim of RCW ......................................................... 38

9.      Class 9 – Priest Retirement Claims ..................................... 38

10.     Class 10 – Extern Priest Claims ........................................ 39

11.     Class 11 – Other Tort Claims ............................................ 39

12.     Class 12 – Tort Claims A .................................................. 40

13.     Class 13 – Tort Claims B .................................................. 45

14.     Class 14 – Tort Claim C ................................................... 50

15.     Class 15 – Unknown Tort Claims ..................................... 51

VIII.    MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN ................... 55

A.     Establishment of Plan Implementation Account ........................... 55

B.     Other Means for Implementing the Plan ................................... 56

C.     Establishment of Disputed Claims Reserve ............................... 56

D.     Payment and Treatment of Claims Other Than Tort Claims ............ 56

E.     Non-Monetary Transfers to the Trust ..................................... 57

F.     Revesting of Debtor's Property and Retained Claims ................... 57

G.     Approval of Section 363 Sales, Cemetery Loan and Settlement Agreements in Confirmation Order ....................................... 58

H.     Debtor Waiver and Release of Claims Against Settling Insurers ....... 58

I.     Debtor Waiver and Release of Participating Parties and Settling Insurers ......... 59

J.     Time for Return and Effect of Late Return of Releases and Certifications by Releasing Tort Claimants ........................... 60

K.     Non-Monetary Commitment to Healing and Reconciliation ............. 60

L.     Procedure for Determination of Claims Other Than Tort Claims ....... 60

M.     Payments Effective Upon Tender ......................................... 62

N.     Preservation of Tort Claimant's Rights Against Co-Defendants ........ 62

O.     Preservation of Debtor's Claims, Demands and Causes of Action ...... 62

P.     Special Provisions Governing Unimpaired Claims ....................... 63

Q.     Return of Deposits ......................................................... 64

R.     Delivery of Distributions (Except to Tort Claimants) ................... 64

S.    Transmittal of Distributions to Tort Claimants and Unknown Tort
      Claims .................................................................................................65

T.    Efforts Regarding Absence of Address or Returned Mail .......................65

U.    Limitation on De Minimis Payments .......................................................65

IX.   CONDITIONS PRECEDENT TO EFFECTIVE DATE ........................................66

A.    Conditions Precedent ...............................................................................66

B.    Waiver of Conditions ...............................................................................67

C.    Non-Occurrence of Effective Date; Effect...............................................67

D.    Merger; Choice of Law ............................................................................67

X.    POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE
      REORGANIZED DEBTOR ................................................................................68

XI.   REORGANIZATION OF THE DEBTOR AND POST-CONFIRMATION
      MANAGEMENT ..............................................................................................70

XII.  LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS ...............71

XIII. INSURANCE MATTERS ....................................................................................72

A.    Settlement with Non-Settling Insurers .....................................................72

B.    Insurance Neutrality ................................................................................73

C.    Judgment Reduction .................................................................................75

XIV.  TREATMENT OF EXECUTORY CONTRACTS .................................................77

XV.   EFFECT OF CONFIRMATION .........................................................................78

D.    Discharge ..................................................................................................78

E.    Vesting ......................................................................................................79

F.    Exculpation and Limitation of Liability...................................................79

G.    Limitation of Liability ..............................................................................80

H.    Channeling Injunction .............................................................................80

I.    Supplemental Injunction Preventing Prosecution of Claims Against
      Settling Insurers and Insured Entities .....................................................81

J.    Terms of Injunctions or Stays and Confirmation of Settlements............83

K.    Limitation of Injunction and Discharge ..................................................83

L.    Retention of Jurisdiction ..........................................................................83

XVI.    FEDERAL TAX CONSEQUENCES ...................................................... 84

      A.    The Trust. .......................................................................................... 84

      B.    Federal Income Tax Consequences to Holders of Claims. .................. 86

XVII.   MODIFICATION OF PLAN ............................................................... 87

XVIII.  SOLICITATION PROCEDURES ...................................................... 88

      A.    Form of Ballots ................................................................................. 88

      B.    Ballot Tabulation .............................................................................. 89

      C.    Submission of Ballots ....................................................................... 90

XIX.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN ......................... 91

      A.    Confirmation Hearing ....................................................................... 91

      B.    Confirmation Standards .................................................................... 91

      C.    Best Interest of Creditors and Liquidation Analysis ......................... 93

      D.    Feasibility ........................................................................................ 94

XX.     ALTERNATIVES TO THE PLAN ........................................................ 94

XXI.    RECOMMENDATION OF THE DEBTOR AND CONCLUSION .............. 95

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF CALIFORNIA AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE § 1125 FOR SOLICITATION OF ACCEPTANCES OF THE DEBTOR'S PLAN OF REORGANIZATION ATTACHED TO THIS DISCLOSURE STATEMENT.    DISTRIBUTION OF THIS DISCLOSURE STATEMENT TO CREDITORS IS AUTHORIZED BY THE ENCLOSED ORDER OF THE UNITED STATES BANKRUPTCY.

## I.    INTRODUCTION

On January 15, 2014 (the "Petition Date"), The Roman Catholic Bishop of Stockton, a corporation sole ("RCB" or the "Debtor"), filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court").  Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (the "Bankruptcy Code").

The Debtor has prepared this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of the Debtor's Plan of Reorganization dated October 26, 2016 (the "Plan").  The purpose of this Disclosure Statement is to provide creditors with adequate information about the Plan as the Debtor solicits acceptances of the Plan from creditors.  A copy of the Plan is attached as Exhibit A to this Disclosure Statement.  Certain settlement agreements defined in the Plan as the Insurance Settlement Agreement and the Participating Agreement are exhibits to the Plan and are integral parts of the Plan.  Those agreements, to the extent not filed with the Plan, will be filed separately with the Bankruptcy Court.

A tragedy that runs contrary to every teaching and tradition of the Church[1] has unfolded in the Church as a whole and in the RCB in particular:  a small number of clergy and others took advantage of their positions of trust and respect in the community to abuse children.  It is

---

[1]   References to the term "Church" refer to the universal church of Roman Catholic belief, seated in the Vatican and currently headed by Pope Francis.

impossible to overstate the tragedy of the Abuse[2] that was inflicted on the children and teenagers of the Diocese. Such Abuse was perpetrated by priests or others purporting to do the work of the Roman Catholic Church. The Church as a whole, and the RCB in particular, is committed to providing for all victims/survivors of Abuse in a fair, just and equitable manner with the available resources of the RCB.

The Debtor proposes the Plan in order to use its limited resources to pay compensation to survivors of Abuse perpetrated by individuals associated with the Diocese. The Debtor has worked since the Reorganization Case was filed to obtain funding from its Insurers and others who may have some liability for some of the claims because of their relationship with the Debtor. The Plan incorporates two settlement agreements through which the Debtor will obtain a significant amount of money committed to the Plan with the Debtor's Insurers and with other Participating Parties. Although the Settling Insurers and Participating Parties dispute any liability to the Debtor or Tort Claimants, each of the Settling Insurers and the Participating Parties will pay a lump sum to the Debtor in exchange for various releases and being included as a Protected Party for purposes of the Channeling Injunction provided under the Plan.

Through the Plan, the Debtor also will restructure its financial affairs to permit the RCB to carry on the RCB's essential ministries and services so the RCB can continue to meet the needs of the Non-Debtor Catholic Entities, parishioners, and others who rely on the RCB's ministry, education, and charitable outreach.

Pursuant to Bankruptcy Code § 1125, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor has examined various alternatives and, based on information contained in this Disclosure Statement, and for the reasons set forth below, has concluded that the Plan provides the best recovery to creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history of the Debtor including a description of its business, assets and

---

[2] Capitalized terms not otherwise defined herein have the meaning given to them in the Plan.

liabilities; (2) factors and events leading to the bankruptcy filing; (3) significant events during the bankruptcy case; and (4) the proposed reorganization of the Debtor and distribution to holders of Claims against the Debtor. The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights.

Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan. Unless otherwise expressly stated, portions of this Disclosure Statement describing the Debtor have not been subject to a certified audit, but have been prepared from the information compiled by the Debtor from the records maintained in the ordinary course of its business. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement.

Your vote on the Plan is important. For the Plan to be accepted by a Class of Claims, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in such class who vote on the Plan must vote to accept it. The Debtor recommends that the holders of Allowed Claims that are entitled to vote on the Plan vote in favor of the Plan.

## II.     OVERVIEW OF THE PLAN

The Debtor commenced its Chapter 11 reorganization case (the "Reorganization Case") to restructure its financial affairs to, among other things, fairly, justly and equitably compensate all of its creditors, including victims of Abuse (known and unknown) by clergy or others associated with the Debtor, trade creditors, and others. The Debtor wants to bring healing to victims, parishioners and others affected by the past acts of Abuse and also to repay its creditors so the Debtor can continue its ministry and mission.

In proposing the Plan, the Debtor seeks first to provide care, compassion and compensation to those who have endured harm. The Plan necessarily recognizes the Debtor's financial limitations, while establishing a fund for those victims who have presently identified themselves and for those who recognize their Claims or identify themselves in the future. The Debtor believes that the Plan is the only means available to it to ensure an equitable and fair

distribution of compensation to victims, some identified and some still unknown.

The Plan will be funded by the Debtor as well as contributions from the Parishes, Settling Insurers and various other Non-Debtor Catholic Entities (defined below).  In addition, certain professionals whose fees would be paid as Administrative Expenses have agreed to defer payment of their fees in order to facilitate the Plan.  The approximately $17.1 million fund, which will consist of cash, deferred professional fees plus a promissory note, represents the significant support of others and sacrifice by the Debtor.

Under the Plan, $14,250,000 in Cash and a $750,000 promissory note will be used to fund a Trust for the exclusive benefit of Tort Claimants and Unknown Tort Claimants.  Trust Assets will be used to fund the Trust's costs and expenses and payments to Tort Claimants.  Tort Claims are divided into Tort Claims A, Tort Claims B, Tort Claim C and Unknown Tort Claims. Distributions from the Trust for Tort Claims A, Tort Claims B and Tort Claim C and provisions for retention of reserves in the Trust are discussed in more detail below.  Allocations of funds designated to Tort Claim classes with multiple claimants will be evaluated and determined by an Abuse Claims Reviewer selected by the Bankruptcy Court as part of the confirmation process. The Tort Claims A Allocation Protocol and Tort Claims B Allocation Protocol will determine distributions from the Trust and the designated Class funds to Tort Claimants.  The $750,000 promissory note will provide the funds for payment of Unknown Tort Claims when and if any such Unknown Tort Claims receive Awards and for related expenses (as and when payable).

The Debtor believes that the Plan provides greater compensation to the Tort Claimants and the Unknown Tort Claimants than they likely would receive outside of Chapter 11 because of, among other things:  (i) limited or no insurance for the period during which some of the Tort Claims arose; (ii) exhaustion of limits of insurance in those instances where insurance has been available; and (iii) the limited resources of the Debtor to respond to judgments outside the Reorganization Case.

**The Plan incorporates two settlement agreements through which the Debtor will obtain a significant amount of money committed to the Plan with the Debtor's Insurers and with other Participating Parties that might have liability for some of the Tort Claims or**

**against which the Debtor may have Claims for contribution, indemnity, allocation of fault or any other basis upon which the Debtor may have rights against such other Entities. The Plan therefore provides settlements with numerous parties. At this time, the Debtor believes all Insurers with Insurance Policies relating to Tort Claims have entered into an Insurance Settlement Agreement and are Settling Insurers. The terms of the Insurance Settlement Agreement involve, in some instances, a sale of certain Insurance Policies or rights or obligations of the Settling Insurers.**

**The other Entities with which the Debtor has an Agreement for funding the Plan (defined as Participating Parties under the Plan) consist of the Parishes, and certain non-profit corporations that work with the RCB in carrying out the RCB's ministry, education, and charitable outreach. Although the Participating Parties dispute any liability to the Debtor or the Tort Claimants, each of the Participating Parties will pay a lump sum to the Debtor in exchange for various releases and being included as a Protected Party for purposes of the Channeling Injunction provided under the Plan and, in the case of RCW, to settle disputes over ownership of real property as well.**

General Unsecured Creditors with Claims of $500 or less will be paid the Allowed amount of their Claims on the Effective Date. General Unsecured Creditors with Claims greater than $500 will be paid Cash 50% of the Allowed amount of their Claims in full satisfaction of such Claims. With certain exceptions, other Allowed Claims will be paid the Allowed amount of their Claims on the Effective Date or in the ordinary course of business. The Plan also provides for restructuring of the Secured Claims against the Debtor, which will be paid over time from the Debtor's future business operations. In addition to the Debtor's promissory note for the Trust, the Debtor will borrow $1 million from the Catholic Cemeteries of the Diocese of Stockton to help fund the Debtor's Plan obligations.

The Plan maintains funding of programs within RCB which are essential to the financial reorganization of this religious organization as well as providing for the continuation of the programs that the Diocese has put in place to educate and screen people working with RCB to ensure that it can continue to provide care and counseling to those injured. The ability of the

Debtor to reorganize its financial affairs and provide an orderly way to deal with victims of Abuse also provides for and allows RCB to continue programs to respond to the crisis, so that individuals of faith and integrity who have the highest standards of behavior will fill the trusted roles of clergy, teachers and administrators.

Importantly, the financial reorganization under the Plan allows the RCB to continue to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other ministries and services to individuals of the Roman Catholic faith, the Non-Debtor Catholic Entities, parishioners, and others who rely on the Diocese's ministry, education, and charitable outreach.

## III.     STATEMENTS REGARDING REPRESENTATIONS

### A.     <u>Definitions and Plan Supremacy</u>

Unless this Disclosure Statement expressly states that a term defined in the Plan will have a different meaning herein, all terms defined in the Plan will have the same meanings when used in this Disclosure Statement. In addition, unless otherwise stated, terms used in this Disclosure Statement will have the same meanings as in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the Bankruptcy Court. Terms defined in this Disclosure Statement which also are defined in the Plan or the other sources described above are solely for convenience when reading this Disclosure Statement; and the Debtor does not intend to change the definitions of those terms from the Plan or from the otherwise applicable sources. Furthermore, in the event of any inconsistency between the Plan and this Disclosure Statement, the Plan will control. The exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.     <u>Limited Representation</u>

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims. It is subject to approval by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan. This Disclosure Statement will be used to solicit acceptances of the Plan only

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

after the Bankruptcy Court enters an order approving this Disclosure Statement as containing adequate information.

In determining whether the Plan should be confirmed, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by parties entitled to vote. Only holders of Allowed Claims that are impaired under the Plan will be allowed to vote to approve or reject the Plan.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN. THE PLAN IS THE OPERATIVE DOCUMENT. THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT A, SHOULD BE READ COMPLETELY. FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

The Bankruptcy Court will hold a hearing on confirmation of the Plan. The date and time of the hearing will be fixed by order of the Court and will be noticed to Creditors after the Disclosure Statement is approved. The Confirmation Hearing may be adjourned from time to time without further written notice.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at RCB or from the books and records of RCB. Financial information developed for purposes of this Disclosure Statement were developed by personnel at RCB working with the Debtor's Professionals. Certain materials contained in this Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents. While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents only after a thorough review of the documents themselves.

Unless otherwise expressly stated, portions of this Disclosure Statement describing the Debtor have not been subject to a certified audit, but have been prepared from the information compiled by the Debtor from the records maintained in the ordinary course of its business. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, THE DEBTOR'S OPERATIONS, THE VALUE OF THE DEBTOR'S ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE DEBTOR ONLY AND IT IS NOT A SOLICITATION BY THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR. THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONAL.

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS OR OTHER FINANCIAL INFORMATION, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

## C.    Voting Procedures

If you are the holder of a Claim that is "impaired" under the Plan and you are entitled to vote, it is important that you vote. In that regard, acceptances of the Plan are sought only from those holders of Claims whose Claims are "impaired" by the Plan and who are not deemed to have accepted or rejected the Plan. Specifically, acceptances are solicited only from those Creditors and parties in interest whose legal, equitable, or contractual rights are altered by the Plan or who will not receive under the Plan the full amounts of their Allowed Claims in Cash.

Holders of Claims which are not impaired under the Plan are deemed to have accepted the Plan. *See* Bankruptcy Code § 1126(f). Conversely, acceptances need not be solicited from the holder of Claims who will receive nothing under the Plan because they are deemed to have rejected the Plan. *See* Bankruptcy Code § 1126(g).

Ballots will be sent to the known holders of Claims who are entitled to vote. For **voting purposes only**, Tort Claims will be estimated at $1.00 and the Debtor has requested that the Court approve this. The holder of a Claim to which an objection has been filed, including any Tort Claims that are the subject of a pending objection as of the date of approval of this Disclosure Statement, is not entitled to vote on the Plan unless the holder timely requests that the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, temporarily allow the Claim in an appropriate amount solely for the purpose of enabling the holder of the Disputed Claim to vote on the Plan, and the Bankruptcy Court does so.

In order for a Class of Claims to vote to accept the Plan, votes representing at least two-thirds in amount and more than one-half in number in that Class must be cast in favor of acceptance of the Plan. As more fully described below, the Debtor is seeking acceptances from holders of Allowed Claims in the following Classes (reserving the right to supplement as to any other impaired Class(es) of Claims, if any):

| Class | Description | Status |
|---|---|---|
| Class 2 | Prepetition Date Secured Tax Claims | Impaired – Entitled to Vote |
| Class 3 | Pastoral Center Lender Secured Claims | Impaired – Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired – Entitled to Vote |
| Class 7 | Claim of F & M Bank | Impaired – Entitled to Vote |
| Class 8 | Claim of RCW | Impaired – Entitled to Vote |
| Class 9 | Priest Retirement Claims | Impaired – Entitled to Vote |
| Class 11 | Other Tort Claims | Impaired – Entitled to Vote |
| Class 12 | Tort Claims A | Impaired – Entitled to Vote |
| Class 13 | Tort Claims B | Impaired – Entitled to Vote |
| Class 14 | Tort Claim C | Impaired – Entitled to Vote |
| Class 15 | Unknown Tort Claims | Impaired – Entitled to Vote |

The following Classes of Claims are not impaired under the Plan or are otherwise

prohibited by the Bankruptcy Code from voting on the Plan for the reason indicated:

| Class | Description | Status |
|-------|-------------|--------|
| Unclassified | Administrative Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Unsecured Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Tax Claims | Unimpaired – Deemed to Accept |
| Class 1 | Priority Employee Unsecured Claims | Unimpaired – Deemed to Accept |
| Class 4 | Non-Priority Employee Claims | Unimpaired – Deemed to Accept |
| Class 5 | General Unsecured Convenience Claims | Unimpaired – Deemed to Accept |
| Class 10 | Extern Priest Claims | Unimpaired – Deemed to Accept |

The specific treatment of each Class under the Plan is set forth in the Plan and is summarized in Article VII of this Disclosure Statement. Bankruptcy Code § 1129(b) provides that, if the Plan is rejected by one or more impaired Classes of Claims, the Plan nevertheless may be confirmed by the Bankruptcy Court, if: (i) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class(es) of Claims that are impaired under the Plan; and (ii) at least one Class of impaired Claims voted to accept the Plan. The Debtor seeks to confirm the Plan under the provisions of Bankruptcy Code § 1129(b) in the event that becomes necessary.

> A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.

## IV.  THE DEBTOR AND ITS OPERATIONS

### A.  The Diocese of Stockton

The Roman Catholic Church is comprised of territories, known as Diocese, each of which is subject to the authority of the Bishop who is responsible for the spiritual and pastoral well-being of the people who live within that Diocese. The Diocese of Stockton (the "Diocese")[3] was

---

[3]  For the avoidance of doubt, the term "Diocese" is used herein exclusively to refer to the religious canonical entity that carries out the mission and ministry of the Roman Catholic Church in the geographic area decreed as the Diocese, subject to the jurisdiction and administration of the Bishop. The terms "RCB" or the "Debtor" are used herein exclusively to refer to the secular legal embodiment of the Diocese.

established on February 21, 1962, by Pope John XXIII from territory formerly located in the Archdiocese of San Francisco and the Diocese of Sacramento. The Diocese, comprising the six counties of San Joaquin, Stanislaus, Calaveras, Tuolumne, Alpine, and Mono, currently serves approximately 250,000 Catholics in 35 parishes (collectively, the "Parishes"). The Debtor is the civil entity formed under the corporation sole statute of the State of California.

The primary role of the RCB is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to individuals of the Roman Catholic faith, the thirty-five Parishes (which collectively operate eighteen Catholic pre- and elementary (K-8) schools as well as thirteen missions), two Catholic high schools and various other Catholic-based social and community service organizations that operate in the Diocese. The RCB has approximately thirty-seven salaried employees and seven hourly employees. In addition, to the RCB's employees, the RCB also has several sisters from various religious orders who provide services to the Diocese.

As a religious organization, the RCB has no significant ongoing for-profit business activities or business income. Revenue for the RCB principally comes from the annual ministry appeal, fees for services provided to the Non-Debtor Catholic Entities, donations, grants, and RCB ministry revenue. The RCB's annual operating budget is approximately $5 million. The RCB operates on a fiscal year ending June 30.

Information regarding the Debtor's historical financial performance is contained in the Audited Financial Statements for fiscal years 2013-14 and 2014-15, which are attached hereto as Exhibit B. Financial information for July 2015 forward is contained in the monthly operating reports filed with the Court.

**B.      Legal Structure of the RCB and Parishes and other Non-Debtor Catholic Entities**

Since its inception in 1962, the RCB has been and continues to be a California corporation sole. When the Diocese was created, most, if not all, of the property of the Parishes (excluding the pre- and/or elementary (K-8) schools) was held in the name of the RCB. The RCB also held the property for the cemeteries in the Diocese as well as some of the real property to be used for

future parishes. The Roman Catholic Welfare Corporation of Stockton ("RCW") also was created in 1962 as a public benefit corporation. The RCW held most, if not all, of the property of the Catholic pre-, elementary (K-8) and high schools in the Diocese. The RCW is now a California religious corporation.

In December 2002, the Diocese reorganized into its current structure. The Parishes in existence in December 2002 were each organized and currently operate as separate corporations sole pursuant to California corporate law. If a Parish had a pre- and/or elementary school, that property also was transferred to the Parish. In addition to the Parishes, in December 2002, the Diocese created four new religious corporations: (a) two to operate the two high schools (St. Mary's High School in Stockton and Central Catholic High School in Modesto, each a separate religious corporation); (b) one to operate a retreat center (Madonna of the Peace Retreat Center in the foothills) ("Retreat Center"); and (c) one to operate three cemeteries (Catholic Cemeteries of the Diocese of Stockton) (collectively, the "Non-Parish Entities"). Additionally in December 2002, most of the real property held by the RCB to be used for future parishes was transferred to the RCW.

Several other separate and independent Catholic entities operate within the territory of the Diocese along with the RCW, Parishes and Non-Parish Entities. Catholic Charities of the Diocese of Stockton ("Catholic Charities") is a California religious corporation formed in 1980 to provide assistance to the needy within the Diocese. SEEDS is a California corporation sole established in 2004 to provide tuition assistance for students attending the eleven elementary schools in the Diocese. Church for Tomorrow is a 501(c)(3) charitable organization created in 2007 to provide assistance for needy churches, develop future churches, provide tuition and school assistance, and provide funding for ministries and other programs within the Diocese. Catholic Charities, SEEDS, Church for Tomorrow, RCW, Parishes and Non-Parish Entities are hereafter referred to collectively as the "Non-Debtor Catholic Entities."

Each of the Non-Debtor Catholic Entities owns its own property, finances its own activities, manages its own assets and is responsible for its own corporate activities. The Non-Debtor Catholic Entities have not sought bankruptcy relief and are not debtors in this

Reorganization Case.

In December 2002, the Diocese also created the Diocese of Stockton Revocable Trust ("Revocable Trust") and the Diocese of Stockton Irrevocable Trust ("Irrevocable Trust"). The Revocable Trust is a pooled investment account in which restricted and unrestricted funds of the RCB and certain Non-Debtor Catholic Entities are held subject to a written trust agreement. The Irrevocable Trust was created to hold the specific, restricted gifts, mostly made through bequests, held by the RCB prior to the December 2002 reorganization and made subsequently.

In February 2014, the Diocese created the Bishop Ministry Appeal Trust, an irrevocable trust created to administer the restricted funds raised in connection with the annual appeal.

**C.**     **The Clergy Sexual Abuse Crisis and RCB Response**

The Catholics of the Diocese have not been immune from the sex abuse tragedy that has sadly affected so many others within the Roman Catholic Church. Formal and informal Claims alleging Abuse at the hands of priests and others in the Roman Catholic Church have been asserted against the Debtor. At the time the Debtor's Reorganization Case was filed, there were four Abuse lawsuits still pending against the RCB alleging liability for failure to supervise or prevent childhood sexual abuse. Of those four cases, three cases were in the discovery stage, and one case had not yet been served. Thirty-four (34) proofs of Claim were filed by Tort Claimants by the Tort Claim Bar Date. Six such claims were withdrawn and two new claims were filed on October 11, 2016, leaving thirty (30) such Claims pending, including one claim that is duplicative. The Future Claims Representative also filed a proof of Claim on behalf of Unknown Tort Claimants.

The inexcusable harm caused by the abusers to the survivors of Abuse, their families and their communities cannot be underestimated. The abusers also betrayed and harmed the Catholic faithful and the Roman Catholic Church through their violation of the fundamental principles and mission of the Roman Catholic Church. Although the Diocese cannot change the tragedies of the past, it has long been committed to combating Abuse of minors in the present.

Prior to 2002, the Diocese had protocols in place to respond to reports of sexual abuse. Among other things, in 1987, the RCB established a written policy for its existing policies and

practices to address issues of sexual abuse of minors, which was revised and updated in 1999 and 2003. In 1999, the RCB published updated requirements for child abuse prevention and reporting requirements to clergy, principals and administrators. The RCB's written policies were updated in 1999 to accompany requirements prepared by the California Catholic Conference in October 1998. Under the protocols, victims were offered assistance in the form of counseling and pastoral assistance. Such assistance has been provided to victims for up to as long as twenty years. The priest accused of abuse was investigated by the Diocese, and the Bishop or other representatives of the Diocese met with the victim. The RCB followed reporting laws.

In the spring of 2002, the U.S. Bishops adopted the *Charter for the Protection of Children and Young People* (the "Charter"), which adopted a "one strike" policy with regard to clergy serving in any active, public ministry, and also included:

- permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor;

- requirement of criminal background checks for adults, including clergy, who work with children and youth;

- implementation of educational programs for the prevention of child sexual abuse for both adults and children;

- provision of behavioral guidelines/ethical standards for ministry;

- establishment of outreach for victims/survivors; and

- creation of a review board to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

Not only has the RCB continuously satisfied the Charter, but it has taken additional steps not required by the Charter to protect children from abuse and to provide healing for those who have been harmed. Examples of the measures taken by the RCB include:

- hiring a victim assistance coordinator to implement the diocesan response to sexual abuse;

- hiring a safe environment coordinator to oversee implementation of all requirements to promote the safety of children and youth;

- providing counseling referrals, spiritual direction, therapy support and other services to assist people who have been abused or affected by abuse;

- continuing to reach out to victims through the years, including paying for counseling for claimants whose cases have been dismissed or settled;

- implementing a Diocesan Review Board (the "Board") in 2002, comprised of lay

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

people and clergy, to review claims of sexual abuse and advise the Bishop;[4]

- requiring fingerprinting of employees and clerics, and conducting background screens of those persons;

- requiring Safe Environmental education for priests, deacons, staff and volunteers in all parishes and schools;

- providing age-appropriate education for school and religious education children to equip them with the skill to help them protect themselves from abuse; and

- participating in annual compliance audits, conducted by independent auditors, to review the implementation of policies and procedures regarding the protection of children.

The harm that was caused by the abusers is unacceptable. Also unacceptable is that the voices of survivors were not heard for too long. Too often when survivors or others on their behalf reached out to the Diocese in the past, their Abuse was not addressed adequately. Unfortunately, the Diocese was not alone in this respect. The Debtor and the Reorganized Debtor are committed to continuing efforts to address these issues. Improvements can always be made and the non-monetary commitments that comprise part of the Plan are part of the ongoing effort of the Debtor and the Reorganized Debtor to review and improve on protections and procedures that are already in place.

The Bishop previously has apologized to survivors for the inexcusable acts that occurred. The Bishop, Debtor and the Diocese want to take the opportunity in this Disclosure Statement to once again apologize to the survivors and their families for the inexcusable harm that was done to them by those in positions of trust and to again commit to be mindful of the need for vigilance and to ensure that the protections already in place as augmented by the non-monetary commitments continue.

In addition to the non-monetary commitments, the overall Plan, the monetary commitments included in the Plan for compensation to Tort Claimants, and the treatment of Unknown Tort Claimants are another step in the effort of the Debtor and the Diocese to bring some healing and closure to the survivors.

---

[4] Initially the Board reviewed all claims that had been made historically to determine if anything else needed to be done with respect to those claims. All new complaints have been reviewed by the Board as the new claims arise.

The Diocese and the Debtor appreciate that there have been too many instances where the survivors' voices have not been heard or acted upon appropriately in the past. That has changed and, as noted above, improvements can always be made. The non-monetary commitments are steps toward continuing to bring these past acts to light and continuing to examine and improve the policies, procedures and responses to protect the Diocese's most valuable resource—its children and its people.

### D.     <u>Need for Reorganization</u>

Prior to filing for bankruptcy in January 2014, the RCB maintained financial viability while funding compensation for Abuse victims and continued litigation regarding claims of sexual abuse. During the twenty years prior to filing its bankruptcy case, the RCB paid approximately $14 million in legal settlements and judgments in an effort to fulfill the RCB's responsibility for abuse of minors by a diocesan priest. This amount does not include attorneys' fees and other costs paid by the RCB or contributions from insurance.

### V.     **THE DEBTOR'S ASSETS AND LIABILITIES**

Based on the schedules and its latest monthly operating report, the property of the RCB's estate totals approximately $6.31 million as of July 31, 2016, net of secured claims and excluding insurance policies, restricted funds and funds held in trust.

### A.     <u>Assets</u>

#### 1.     **Real Property**

The Debtor owns certain real property consisting of: (i) the pastoral/meeting center located at 212 & 220 N. San Joaquin Street, Stockton, California ("Pastoral Center"); (ii) the Bishop's residence located at 205 E. Harding Way, Stockton, California ("Bishop's Residence"), (iii) the University of the Pacific Newman Center/St. John Vianney House, located at 4101 N. Manchester, Stockton California ("Newman Center"); and (iv) approximately 15 acres of vacant land in Valley Springs, California which is restricted by the donor for use as a future parish in the Valley Springs area ("Restricted Lot"). As of the Petition Date, the Debtor owed more to the secured creditors on the Pastoral Center than the appraised value of that property, so there is no value in that property for the benefit of Creditors. Due to the restrictions on the Restricted Lot,

the Debtor does not believe that property can be liquidated for the benefit of Creditors.

The estimated combined fair market value of the Bishop's Residence and the Newman Center approximately $434,393. There is no secured debt against either of these properties.

**2.     Personal Property**

The personal property of the Debtor (excluding insurance policies, restricted funds and funds held in trust) generally consists of the following:

(i)     $1,546,434 in unrestricted cash and investment funds;

(ii)    $3,551,892 in liquidated funds from a rabbi trust pension plan for the priests;

(iii)   $27,000 in notes receivable (net of $100,000 for bad debt);

(iv)    $402,583 in unrestricted accounts receivable from Non-Debtor Catholic Entities (net of $711,364 for bad debts);

(v)     $94,556 in other accounts receivable (including $44,676 in retainers held by professionals);

(vi)    $126,821 in other personal property; and

(vii)   $130,455 in funds from the sale of real property in which the RCB has an ownership dispute with the RCW.

**3.     Insurance**

RCB is the insured under certain general liability insurance policies (including sexual misconduct) which were issued or allegedly issued at various times relevant to the times at which certain Tort Claims are alleged to have occurred. The Insurers issuing or allegedly issuing the Insurance Policies and the effective year(s) for each Insurance Policy are set forth in the Schedules. Some of the Insurance Policies are occurrence policies which mean that if the act occurred during a policy year, regardless of when the claim is made, then the claim is covered by the applicable Insurance Policy. Some of the Insurance Policies are "claims made" policies which means that the relevant time period for determining coverage is not the date of occurrence, but the date the claim is first made.

All of the Insurers have been put on notice of the Tort Claims which are known to the Debtor. The Debtor contends that it has various claims against the Insurer related to coverage and

additional claims arising out of an Insurer's actions with respect to coverage and settlement (or failure to settle) of the Tort Claims.

Each Insurer has been given an opportunity to participate in the Plan and become a Settling Insurer. Any Insurer that has failed to settle with the Debtor on terms and conditions acceptable to the Debtor and approved by the Bankruptcy Court will not receive the benefits of a Settling Insurer under the Plan. To date, Settling Insurers will be contributing a total of $3,305,000 as follows:

|     |     |     |
| --- | --- | --- |
| (a) | Beazley Group | $1,200,000 |
| (b) | The Ordinary Mutual | $  975,000 |
| (c) | St. Paul Travelers Insurance | $  375,000 |
| (d) | Great American Insurance Companies | $  325,000 |
| (e) | Pacific Indemnity | $  200,000 |
| (f) | North Star/General Star Management Co. | $  100,000 |
| (g) | ACE USA | $    50,000 |
| (h) | Fireman's Fund insurance Company | $    50,000 |
| (i) | Security/Arrowhead Indemnity | $    30,000 |
|     | Total | $3,305,000 |

At this time, the Debtor believes all Insurers with Insurance Policies relating to Tort Claims have entered into an Insurance Settlement Agreement and are Settling Insurers. While there may be Insurance Policies with Non-Settling Insurer that cover Tort Claims, the Debtor is not placing any value on such potential Assets at this time.

**4.    Restricted Assets**

There are various Assets which the Debtor lists on its financial statements as being held for others. As a non-profit religious organization, RCB is the recipient of grants, gifts and other assets which are subject to restrictions imposed by the donor or the grantor of the grant. The restricted assets are not property of the Estate nor are they available for distribution to Creditors.

**5.    Avoidance Actions**

*a.    Preferences*

Pursuant to Bankruptcy Code § 547, a debtor in possession can recover certain payments made to creditors within ninety (90) days of the Petition Date or within one (1) year if the payment is made to an insider (as defined in the Bankruptcy Code). Not all such payments are subject to being paid back to the Estate and various defenses are available to Creditors against

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

whom such claims are made. As of the date of this Disclosure Statement, the Debtor does not believe that any of the payments made by the Debtor within either of the two periods provided in Bankruptcy Code § 547 are recoverable. To the extent claims to recover such payments have not been tolled or settled, the Debtor will not pursue recovery of any such payments.

*b.*     *Fraudulent Transfers*

Pursuant to Bankruptcy Code §§ 544 and 548, a debtor in possession can avoid certain transfers of property as fraudulent transfers. Not all transfers are subject to being avoided and various defenses are available to the transferee against whom such claims are made. Except for Avoidance Actions being settled in connection with confirmation of the Plan, the Debtor does not believe any transfers are avoidable. To the extent claims to recover such transfers have not been tolled or settled, the Debtor will not pursue those actions.

**B.     <u>Liabilities</u>**

**1.     Priority Claims and Accrued Employee Leave**

The Debtor has $73,389 of priority claims for accrued vacation and paid time off ("Accrued Leave"), which the Bankruptcy Court has authorized to be used post-petition in the ordinary course of business. The priority Accrued Leave is in addition to the approximately $212,500 in general unsecured claims for non-priority Accrued Leave.

**2.     Trade Debt**

The Debtor, as a business, has incurred certain trade debt. As of the Petition Date, the Debtor believed that it had approximately $54,000 in trade debt. The Debtor currently estimates trade debt at approximately $60,000.

**3.     Claim of F & M Bank**

Approximately $4.68 million is owed to Farmers and Merchants Bank ("F & M Bank") for a loan to the RCB (approximately $1.64 million) and a guarantee by the RCB on debt of the RCW (approximately $3.04 million).

**4.     Claims of Undersecured Creditors**

Approximately $234,000 is owed for the undersecured portion of the $1.6 million lien against the RCB's Pastoral Center.

**5.      Claim of RCW**

The Debtor owes over $170,000 to RCW to reimburse the RCW for amounts the RCW has paid to F & M Bank for the loan on which the RCB is the primary borrower and the RCW is the guarantor.

**6.      Claim of Madonna of Peace Retreat Center**

The Debtor owes $100,000 to the Madonna of Peace Retreat Center.

**7.      Priest Retirement Claims**

The Debtor has approximately $6.25 million in for claims filed by priests for accrued retirement benefits as well as contingent claims for restricted funds related to retirement monies paid to the RCB by Parishes on behalf of non-incardinated priests employed by the Parishes.

**8.      Tort Claims**

Thirty-four Tort Claims were filed against the RCB.  One claim is duplicative and six claims have subsequently been withdrawn, leaving twenty-seven remaining Tort Claims.  In addition, the Future Tort Claim Representative filed a proof of claim based on Abuse.  Two Tort Claims (Claim Nos. 153 and 154) were filed after the Bar Date for Tort Claims, which claims shall be treated as Unknown Tort Claims in Class 15 under the Plan.  It is virtually impossible to quantify the aggregate amount of the Tort Claims due to the unliquidated nature of Claims based on Abuse.

**VI.    SIGNIFICANT EVENTS IN CHAPTER 11**

**A.      <u>Retention of Debtor's Professionals</u>**

Subsequent to the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its business as the debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.  By order of the Bankruptcy Court, Felderstein Fitzgerald Willoughby & Pascuzzi LLP was appointed as the RCB's Chapter 11 counsel; Neumiller & Beardslee APC as the RCB's special counsel; Meredith, Weinstein & Numbers, LLP as the RCB's special insurance counsel; Greeley Asset Services, LLC as the RCB's financial consultant; Reverend Mark Pranaitis, C.M., Ph.D. as the RCB's consultant with regard to the "As One" project; and Moss Adams, LLP as an independent auditor to perform the RCB's audit for fiscal years ending

June 30, 2014, June 30, 2015, and June 30, 2016.

### B.    Appointment of Creditors' Committee

Pursuant to Bankruptcy Code §§ 1102(a) and 1102(b), the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in the Debtor's Reorganization Case. The Committee consists of F & M Bank and four individuals who hold Tort Claims against the Debtor. By order of the Bankruptcy Court, Pachulski Stang Ziehl & Jones LLP was appointed a counsel for the Committee and Berkeley Research Group, LLC was appointed as the Committee's accountant and financial advisor.

Since its appointment, the Committee has taken an active role in the Debtor's Reorganization Case and been involved in virtually every major event that transpired during the Chapter 11 process. The Committee also has performed its investigatory function by reviewing information supplied by the Debtor, as well as conducting its preliminary investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other Creditors. The Committee also has negotiated the terms of the Plan with the Debtor.

### C.    Stipulations

On March 12, 2014, this Court authorized the Debtor to enter into a stipulation with Blue Shield of California regarding post-petition adequate assurance with respect to the Debtor's partially self-funded health plan for the Debtor's employees as well as the employees of the Non-Debtor Catholic Entities.

On August 7, 2014, this Court authorized the Debtor to enter into a stipulation for the turnover to the Debtor of funds held in a rabbi trust. Those funds, in the approximate amount of $3.55 million, have been turned over to the Debtor and are being held in a segregated account.

On November 3, 2015, December 2, 2015, February 29, 2016, and August 24, 2016, the Court approved stipulations among the Debtor, the Committee and various Non-Debtor Catholic Entities to extend certain limitation periods for filing certain causes of action against the Non-Debtor Catholic Entities as well as the time for the Committee to seek standing to prosecute claims against one or more of the Non-Debtor Catholic Entities (including, without limitation, seeking discovery with respect to the Committee's standing request).

### D.     Future Claims Representative

On December 9, 2014, Michael Murphy of AlixPartners, LLC was appointed as the Future Claims Representative. The Future Claims Representative is the legal representative appointed to represent the interests of Unknown Tort Claimants in the Debtor's bankruptcy case. By order of the Bankruptcy Court, AlixPartners, LLC has been appointed to assist Mr. Murphy in his role as Future Claims Representative.

### E.     Sale of Eucharistic Sisters' Residence

On October 3, 2014, the Court authorized the Debtor to sell pursuant to a stipulated procedure the Eucharistic Franciscan Sisters' Residence (the "Residence") pursuant to a stipulated procedure. The Debtor believes the Residence is the Debtor's property, but the Residence was actually titled in the name of RCW. The stipulated procedure worked out among the Debtor, the Committee and the RCW allowed the Residence to be sold. The sale proceeds are being held in a segregated account pending resolution over ownership between the Debtor and the RCW. Under the Plan, the dispute over ownership of the sale proceeds will be resolved and the sale proceeds will be used as partial funding for the Trust for the benefit of Tort Claimants.

### F.     Bar Dates

By order dated May 8, 2014, the Bankruptcy Court set claims bar dates and procedures. The bar date for filing Unsecured Claims by a non-governmental unit was May 22, 2014. The bar date for filing Unsecured Claims by a governmental unit was July 14, 2014. The bar date for filing Tort Claims was August 15, 2014. Notice of the various bar dates was sent to over 70,000 entities and households. In addition, publication notice of the Tort Claim Bar Date was made in approximately 23 local and regional newspapers on two separate occasions and once in a national newspaper.

The Debtor and the Committee's professionals have reviewed the Claims filed by Creditors. A total of 34 Tort Claims have been filed timely in the Debtor's Reorganization Case, of which one is duplicative and six have been withdrawn.

### G.     Plan Exclusivity

Pursuant to Bankruptcy Code § 1121, a debtor-in-possession is granted a 120-day

1  exclusive period from the Petition Date to file a plan of reorganization. During such time, only
2  the Debtor can file a plan of reorganization. However, the Bankruptcy Code provides that the
3  Bankruptcy Court can increase a debtor's exclusivity period to file and confirm a plan of
4  reorganization for cause shown up to eighteen months after the Petition Date. The Bankruptcy
5  Court granted such extensions to the Debtor. Prior to the expiration of the Debtor's exclusive
6  right to file a plan of reorganization on July 15, 2015, the Debtor, Committee and certain other
7  parties stipulated that, unless the Debtor and the Committee agreed otherwise, no party would file
8  a plan of reorganization without providing at least sixty (60) days' notice to the Debtor and the
9  Committee of their intent to file a plan or disclosure statement.

10  **H.    Appointment of Post-Petition Mediator**

11  Shortly after the Petition Date, the Bankruptcy Court appointed the Honorable Gregg W.
12  Zive, United States Bankruptcy Judge for the District of Nevada, as a judicial mediator in this
13  Reorganization Case. In an effort to reach a consensual resolution of the Reorganization Case,
14  the Debtor, along with the Committee, Insurers and Non-Debtor Catholic Entities, participated in
15  several mediation sessions over a two-year period. In-person mediation sessions occurred in
16  April 2014, July and December 2015, and January and April 2016. The Debtor also engaged in
17  limited discovery with significant creditor constituencies as part of the mediation process.

18  As a result of the ongoing assistance and extensive involvement of Judge Zive, the parties
19  were able to reach a settlement in connection with the April 2016 mediation, which formed the
20  basis for the Plan.

21  **VII.   SUMMARY OF PLAN OF REORGANIZATION**

22  The Debtor submits that the treatment of Creditors under the Plan is more favorable than
23  the treatment Creditors would receive if the Reorganization Case were converted Chapter 7.
24  Therefore, the Debtor submits that the Plan is in the best interests of Creditors and the Debtor
25  recommends acceptance of the Plan by holders of Claims in Classes 2, 3, 6, 7, 8, 9, 11, 12, 13, 14
26  and 15.

27  **A.    Overview of Chapter 11**

28  Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.

Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest holders. Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder is impaired under or has accepted the plan, or receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the Plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are presumed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such unimpaired classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Bankruptcy Code § 1123 provides that a plan of reorganization shall classify the claims of

a debtor's creditors and interest holders.  In compliance therewith, the Plan divides Claims and Interests into various classes and sets forth the treatment for each class.  The Debtor believes that the Plan has classified all Claims and Interests in compliance with Bankruptcy Code § 1122, but it is possible that a holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtor intends, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted class or classes of which the accepting holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the class in which such holder was initially a member, or any other class under the Plan, by changing the composition of such class and the vote required of that class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL,

UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTOR, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

### B.    Contributions to the Plan

The Plan is premised on the contribution of approximately $17.1 million to fund the Plan and related expenses.  The following monetary contributions will be made to fund the Plan pursuant to the Plan and, in some cases, the Insurance Settlement Agreement and the Participating Party Agreement (which are exhibits to the Plan and may be reviewed for further information):

| Party | Commitment |
|---|---|
| Debtor | $6,400,000 Cash from current assets; $1.295 million received for settlement of Avoidance Action claims regarding All Saints University Church; up to $1 million borrowed pursuant to the Cemetery Loan; payment of deferred attorneys' fees over time in the approximate amount of $445,000; and a $750,000 promissory note to fund the Unknown Tort Claims Fund, for a total of $9,890,000 |
| Settling Insurers | $3,305,000 from Settling Insurers in the specific amounts set forth in IV.A.3, above |
| Non-Debtor Catholic Entities | $2,905,000 |
| RCW | $1,000,000 |

Each of the contributions listed above, except for those from the Debtor, will be made pursuant to various settlement agreements:

### 1.    Insurance Settlement Agreement

The settlements the Debtor reached with the Settling Insurers are integral parts of the Plan. Disputes existed between the Debtor and each of the Settling Insurers regarding the extent of the Debtor's coverage.

The Settling Insurers contend, for a variety of reasons, that the foregoing settlement amounts exceed the amounts they could be deemed obligated to pay pursuant to the Insurance

Policies and/or applicable statutes in connection with the Tort Claims, including any Unknown Tort Claims that might be asserted against the Debtor. The Debtor disagrees, but given the substantial time and financial resources it would take for the parties to litigate the Insurance Coverage issues to completion, the extremely limited financial resources of the Debtor, the risks of litigation, and the potential for appeals to further delay recoveries to the Estate and the Tort Claimants, it is in all constituencies' best interests to resolve the Claims and disputes consensually. The negotiated resolution of the numerous Insurance Coverage related issues results in a substantial recovery for the Estate, which money will be available to fund the Plan pursuant to the negotiated settlements and the terms of the Plan including providing recovery for Tort Claimants. Therefore, the Debtor is requesting that the Court approve the Insurance Settlement Agreement as part of the Confirmation Order.

The Plan provides the ability for Insurers that currently are Non-Settling Insurers to become Settling Insurers after the Effective Date; however, the Debtor is not aware of any Non-Settling Insurers with coverage for Tort Claims who are not already Settling Parties. Nonetheless, all such rights are preserved. To the extent any Non-Settling Insurer would request to become a Settling Insurer, the Trustee would file and notice a motion for an order approving any such agreement; however, the Reorganized Debtor has standing and the right to object to any such motion. In all events, any such agreement must be approved by the Bankruptcy Court.

Principal terms of the Insurance Settlement Agreement include:

1. <u>Settlement Amount/Purchase Price</u>. The Settling Insurers will pay the amounts indicated above, upon agreed notice, pursuant to the terms of the Insurance Settlement Agreement. The Trust will then become the entity to which all Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the Debtor, the Settling Insurers, and other Participating Parties.

2. <u>Releases</u>. The Debtor, on the one hand, and the Settling Insurers, on the other, will grant mutual releases as to, among other things, any and all past, present, or future Claims in connection with, relating to, or arising out of, in any manner or fashion, the Tort Claims, the coverage for the Tort Claims under the Insurance Policies and the Reorganization Case, as set

forth in the Insurance Settlement Agreement.

3.     <u>Sale and Buyback of Policies</u>.  The Debtor will sell all of its Tort Claim Interests in the Released Insurance Policies to the Settling Insurers, respectively, free and clear of all liens, Claims, encumbrances, interests, Insurance Coverage and other rights of any nature, whether at law or in equity, relating to (a) Tort Claims; or (b) Related Insurance Claims pursuant to 11 U.S.C. § 363 as provided in the Insurance Settlement Agreement.  Such sale will be approved, along with the settlements themselves, as part of the Confirmation Order.

4.     <u>Supplemental Injunction</u>.  The Settling Insurers will be entitled to receive the benefit of a supplemental injunction under the Plan and Confirmation Order pursuant to 11 U.S.C. §§ 105(a) and 363.  Any and all Entities who have held, now hold or who may in the future hold any Tort Claim Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, perpetrators, Non-Settling Insurers, trade and other creditors, Tort Claimants, Unknown Tort Claimants and all others holding Tort Claim Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreement) against any of the Settling Insurers, the Insured Entities or the Released Insurance Policies will be permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Tort Claim Interests against the Settling Insurers, Insured Entities, and/or the Released Insurance Policies.

5.     <u>Conditions to Settling Insurers' Payment</u>.  The Settling Insurers' payments are conditioned on, among other things, approval of the Insurance Settlement Agreement, entry of the Confirmation Order which includes a Channeling Injunction and Supplemental Injunction, and such order becoming a Final Order.  The Plan must be in all aspects consistent with the Insurance Settlement Agreement and contain no provisions that diminish or impair the benefits to which the Settling Insurers are entitled under the Insurance Settlement Agreement.

Except as expressly set forth in the Insurance Settlement Agreement, the Plan and Confirmation Order will have no effect on any Insurance Coverage under any certificates or policies of insurance issued to the Debtor and are not otherwise released or sold pursuant to the Insurance Settlement Agreement.

## 2.       Participating Party Settlements

The settlements the Debtor reached with certain Entities known, by virtue of such settlements, as Participating Parties under the Plan, are integral parts of the Plan. The Participating Parties, including the Parishes, other Non-Debtor Catholic Entities and RCW, are separately incorporated third parties. Certain of the Parishes and third parties could potentially face liability from the Tort Claims, because of certain individuals that were at some point employed by or affiliated with them. RCW has a dispute, described elsewhere herein, with the Debtor relating to ownership of certain sale proceeds. Based on a restructuring of the Debtor in 2002, the Committee's position is that the Non-Debtor Catholic Entities could potentially be subject to certain Avoidance Actions (although the Debtor and the Non-Debtor Catholic Entities disagree). The Committee's position is that the Church for Tomorrow Fund, though separate and separately incorporated from the Debtor and exists in order to fund certain programs that are important to the mission and ministry of the Diocese, could also be subject to Avoidance Actions (although the Debtor and Church for Tomorrow Fund disagree).

Each of the Participating Parties contends, for a variety of reasons, that the foregoing settlement amounts exceed the amounts they could be deemed obligated to pay in connection with the Claims described above and/or the Tort Claims, including any Unknown Tort Claims that might be asserted against the Debtor, or in connection with their various other disputes with the Debtor. Many of the Participating Parties dispute that they would be liable for any amount. However, given the substantial time and financial resources it would take for the parties to litigate such issues to completion, the extremely limited financial resources of the Debtor, the risks of litigation, and the potential for appeals to further delay recoveries to the Estate and the Tort Claimants, it is in the best interests of all the constituencies to resolve these issues consensually which also assist in facilitating a resolution between the Debtor and the Tort Claimants and form the basis of a consensual plan. Given the foregoing, the Debtor will request the Court approve the Participating Party Agreement as part of the Confirmation Order.

The Plan provides the ability for Entities which currently are not Participating Parties to become Participating Parties after the Effective Date. Among other things, the Bankruptcy Court

must enter an Order approving the agreement in order for any Entity to become a Participating Party after the Effective Date.

Principal terms of the Participating Party Agreement include:

1.     <u>Settlement Amount/Purchase Price</u>.  The Participating Parties will provide the amounts indicated above, upon agreed notice, pursuant to the terms of the Participating Party Agreement.  The Trust will then become the entity to which all Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the Debtor, the Settling Insurers, and other Participating Parties.

2.     <u>Releases</u>.  The Debtor, on the one hand, and the Participating Parties, on the other, will grant the mutual releases set forth in the Participating Party Agreement.

3.     <u>Conditions to Participating Parties' Payments</u>.  The Participating Parties' payments are conditioned on, among other things, entry of the Confirmation Order which includes the Channeling Injunction, and such order becoming a Final Order.  The Plan must be in all aspects consistent with the Participating Party Agreement and contain no provisions that diminish or impair the benefits to which the Participating Parties are entitled under the Participating Party Agreement.

### C.     <u>Effective Date</u>

The Effective Date will occur on the first Business Day after the conditions to effectiveness stated in Section 29.1 of the Plan have been satisfied, unless the Confirmation Order is stayed by an order of the Bankruptcy Court, the District Court, or another appellate court.  Nothing in the Plan precludes the date by which the Effective Date has to occur from being extended by agreement between the Committee and the Debtor, although there is no requirement that either the Committee or the Debtor agree to any such extension.

The Effective Date triggers many of the obligations of the parties under the Plan, including funding the Plan and payment of certain Claims.  However, the Effective Date may occur before all Claims have been Allowed by the Bankruptcy Court and may occur before all Tort Claims have been determined under the Allocation Protocols.  Accordingly, in the description of the treatment of Claims below and in the Plan, the payment of Claims is, in some

cases, triggered by the Claim Payment Date, which is defined in the Plan thirty (30) days after the Effective Date or the date on which a Claim becomes an Allowed Claim by a Final Order. Payment of Tort Claims and Unknown Tort Claims shall be governed by the Allocation Protocols and the Trust Agreement.

Treatment of different Classes of Claims is described below. However, whether or not any payment is made on account of a Claim under the Plan depends on whether it is a Tort Claim (the definition of which includes Unknown Tort Claim for this purpose), or, if not, whether it is Allowed by the Bankruptcy Court. Tort Claim determination and distribution will be governed by the Plan, Allocation Protocols and the Trust Agreement. A Claim that is not a Tort Claim may be Allowed in one of three ways: (1) it was listed in the Debtor's Schedules as undisputed and in a liquidated amount even if no proof of Claim was filed by the holder of the Claim; (2) a timely proof of Claim was filed by the holder of the Claim and no objection to the proof of Claim was timely filed in accordance with the treatment the applicable Class of Claims; or (3) if an objection was filed to a proof of Claim, then upon entry of a Final Order allowing the Claim.

### D.    Specification and Treatment of Unclassified Claims

The Plan identifies several types of Claims as unclassified and treats those Claims in accordance with the Bankruptcy Code and applicable law: Administrative Claims, Professional Fee Claims, Priority Unsecured Claims and Priority Tax Claims.

### 1.    Administrative Claims (other than Professional Fee Claims)

Administrative Claims include any actual and necessary costs or expenses of administration under Bankruptcy Code § 503, post-petition operating expenses, certain post-petition property tax claims, charges assessed against the Estate under Chapter 123 of Title 28, United States Code, and any Claim for or related to Abuse occurring after the Petition Date through the Confirmation Date. The Plan provides Administrative Claims (other than Professional Fee Claims, Administrative Claims incurred postpetition by the Debtor or Administrative Claims related to Abuse occurring after the Petition Date through the Confirmation Date) will be paid in Cash in full in the Allowed amount on the Effective Date or, if later, the applicable Claim Payment Date, or by any alternative arrangement agreed to by the

Claim holder or ordered by the Bankruptcy Court. If an Administrative Claim was incurred postpetition by the Debtor in the ordinary course of its operations or arising pursuant to one or more postpetition agreements or transactions entered into by the Debtor with Bankruptcy Court approval, such Administrative Claim shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court. If an Administrative Claim is related to Abuse occurring after the Petition Date through the Confirmation Date, such Administrative Claim will be paid on the Claim Payment Date after settlement or entry of a Final Order in the appropriate non-bankruptcy forum and, without in any way limiting the payment obligation of the preceding clause, may be paid from Insurance Policies issued by Non-Settling Insurers covering such Claim.

Except for Chapter 11 Professionals, all requests for payment of administrative costs and expenses incurred prior to the Effective Date pursuant to Bankruptcy Code §§ 507(a)(1) and 503(b) will be served and filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date. Any such Claim which is not served and filed within this time period will be forever barred. Any Claims for fees, costs, and expenses incurred by any Chapter 11 Professionals after the Effective Date will be treated as part of the fees and expenses of the Reorganized Debtor and need not be submitted to the Bankruptcy Court for approval.

### 2. Professional Fee Claims

Professional Fee Claims include those fees and expenses approved by the Bankruptcy Court under Bankruptcy Code §§ 330, 331, 503(b) and the terms of the Plan. Chapter 11 Professionals shall file final fee applications for approval of Professional Fee Claims on or before sixty (60) days after the last day of the month in which the Effective Date occurs. The Reorganized Debtor shall pay all Allowed Professional Fee Claims within five (5) Business Days of entry of a Final Order approving such Professional Fee Claims, unless otherwise ordered by the Bankruptcy Court or agreed between the Chapter 11 Professional and the Reorganized Debtor.

///

### 3.      Priority Unsecured Claims

Priority Unsecured Claims include any claim entitled to priority under Bankruptcy Code § 507 that is not an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a Priority Employee Unsecured Claim. The Plan provides Priority Unsecured Claims will be paid in Cash in full in the Allowed amount on the Effective Date or, if later, the applicable Claim Payment Date, or by any alternative arrangement agreed to by the Claim holder or ordered by the Bankruptcy Court.

### 4.      Priority Tax Claims

Priority Tax Claims include all unsecured Claims entitled to priority pursuant to Bankruptcy Code § 507(a)(8) and provides for the treatment authorized by Bankruptcy Code § 1129(a)(9)(C).

### E.      Treatment of Classified Claims

The Plan classifies several types of Claims as unclassified and treats those Claims as follows:

### 1.      Class 1 – Priority Employee Unsecured Claims

a.      *Classification:* Class 1 consists of all Priority Employee Unsecured Claims. This Class is defined to include every Unsecured Claim of an employee of the RCB for: (a) vacation or sick leave pay which is otherwise entitled to priority pursuant to Bankruptcy Code § 507(a)(4)(A); and (b) contributions to an employee benefit plan which are otherwise entitled to priority pursuant to Bankruptcy Code § 507(a)(5).

b.      *Treatment:* All Allowed Priority Employee Unsecured Claims will be satisfied, in full, without interest, in accordance with the policies and procedures regarding vacation and sick leave pay in effect at the RCB at the time such Priority Employee Unsecured Claim becomes matured and liquidated. No holder of an Allowed Priority Employee Unsecured Claim will receive any Cash on account of such Claim except to the extent that the employee is entitled to a Cash payment in accordance with the policies and procedures of the RCB.

c.      *Voting:* Class 1 is unimpaired and holders of Allowed Class 1 Claims are not entitled to vote under the Plan.

1

2.        **Class 2 – Prepetition Date Secured Tax Claims**

2                a.        *Classification:*  Class 2 consists of all Prepetition Date Secured Tax

3    Claims.  This Class is defined to include every whole or prorated portion of a Secured Tax Claim

4    which arises before and up to the Petition Date.

5                b.        *Treatment:*  All Class 2 Claims, as and when they are Allowed

6    Claims, will be treated as fully Secured Claims and will be paid fully in Cash as follows:

7                        (i)        In order to compute the Prepetition Date Secured Tax

8    Claims which are the Class 2 Claims, the Property Tax Claims Proration will be conducted as of

9    the Effective Date, if necessary.  The Prepetition Date Secured Tax Claims which are Allowed

10   Claims will bear interest from and after the Effective Date until they are paid in full at the rate of

11   eighteen percent (18%) per annum or such other rate as ordered by the Bankruptcy Court.

12                       (ii)       The Allowed Class 2 Claims, including interest thereon

13   from and after the Effective Date, will be paid in three (3) equal installments.  The first (1st)

14   installment will be paid on the first Business Day which is ninety (90) days after the later of the

15   Effective Date or the Claim Payment Date.  The second (2nd) installment will be paid on the first

16   Business Day after the first (1st) anniversary of the later of the Effective Date or the applicable

17   Claim Payment Date.  The third (3rd) installment will be paid on the first Business Day after the

18   second (2nd) anniversary of the later of the Effective Date or the applicable Claim Payment Date.

19                       (iii)      No penalties will be paid on any of the Allowed Class 2

20   Claims.

21                       (iv)       Notwithstanding the pendency of any appeal to any state or

22   local taxing authorities of a determination of property taxes or assessment on the Petition Date,

23   nothing contained herein will prohibit the Debtor from exercising its rights pursuant to

24   Bankruptcy Code § 505 and having the Class 2 Claim(s) determined by the Bankruptcy Court to

25   the extent that any Class 2 Claims are Disputed Claims.

26                       (v)       Each creditor holding a Class 2 Allowed Claim will retain

27   its lien(s) on its collateral to the extent of its Class 2 Allowed Secured Claim.

28   ///

c.     *Voting:*  Class 2 is impaired and holders of Allowed Class 2 Claims may vote to accept or reject the Plan.

**3.     Class 3 – Pastoral Center Lender Secured Claims**

a.     *Classification:*  Class 3 consists of Pastoral Center Lender Secured Claims.  This Class includes the individuals or Entities who hold fractional interest promissory notes secured by the Pastoral Center, as shown in proof of claim numbers 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13.

b.     *Treatment:*  The outstanding pre- and post-petition arrears as of the Effective Date owed to the holders of Allowed Pastoral Center Lender Secured Claims in Class 3 will be added to the principal due under the Pastoral Center Loan.  The Allowed Class 3 Pastoral Center Secured Lender Claims will be paid in monthly installments of principal and interest at the rate of three and one-quarter percent (3.25%) per annum from the Effective Date and thereafter amortized over ten (10) years from the Effective Date until paid in full.  The first payment on the Allowed Class 3 Pastoral Center Lender Secured Claims will be due on or before the later of January 1, 2017, or the first (1st) day of the month that is at least fifteen (15) days after the Effective Date and continuing on the first (1st) day of each month thereafter until paid in full. The Pastoral Center Loan Documents will be modified to the extent necessary to conform to the Plan.

Holders of the Class 3 Pastoral Center Lender Secured Claims will retain their lien(s) on the Pastoral Center to the extent of their Class 3 Pastoral Center Lender Secured Claims until the Class 3 Claims are paid as provided in the Plan.

c.     *Voting:*  Class 3 is impaired and holders of Allowed Class 3 Claims may vote to accept or reject the Plan.

**4.     Class 4 – Non-Priority Employee Claims**

a.     *Classification:*   Class 4 consists of all Non-Priority Employee Claims.  This Class includes an Unsecured Claim of an employee of the RCB for: (a) vacation or sick leave pay which is not entitled to priority pursuant to Bankruptcy Code § 507(a)(4)(A); and (b) contributions to an employee benefit plan which are not entitled to priority pursuant to

Bankruptcy Code § 507(a)(5); provided however, that a Non-Priority Employee Claim shall not include any Other Tort Claim.

            b.     *Treatment:*   All Allowed Non-Priority Employee Claims will be satisfied, in full, without interest, in accordance with the policies and procedures regarding vacation and sick leave pay in effect at the RCB at the time such Non-Priority Employee Claim becomes matured and liquidated. No holder of an Allowed Non-Priority Employee Claim will receive any Cash on account of such Claim except to the extent that the employee is entitled to a Cash payment in accordance with the policies and procedures of the RCB.

            c.     *Voting:*   Class 4 is unimpaired and holders of Allowed Class 4 Claims are not entitled to vote under the Plan.

         **5.      Class 5 – General Unsecured Convenience Claims**

            a.     *Classification:*    Class 5 consists of all General Unsecured Convenience Claims. This Class includes holders of Claims that would be a General Unsecured Claims except that it is in an amount of $500 or less, inclusive of interest, or holders of a General Unsecured Claim in excess of $500 who elect to reduce their Claims to $500.

            b.     *Treatment:*   Every Creditor holding a Class 5 Claim, as and when such Class 5 Claim is or becomes an Allowed General Unsecured Convenience Claim, will be paid in Cash on the later of the Effective Date or the Claim Payment Date. General Unsecured Convenience Claims are Claims that would otherwise be General Unsecured Claims except that they are in an amount of, or reduced to, $500.00 or less, inclusive of interest accrued thereon after the Petition Date through the later to occur of the Effective Date or the Claim Payment Date. Such an election to reduce a Claim to $500.00 to enable treatment as a General Unsecured Convenience Claim must be made on the Ballot, completed and returned within the time fixed by order of the Court. Making this election will be deemed to be a waiver by such electing holder of any right to participate in Class 6 as to any and all Claims held by such holder.

            c.     *Voting:*   Class 5 is unimpaired and holders of Allowed Class 5 Claims are not entitled to vote under the Plan.

///

**6.**     **Class 6 – General Unsecured Claims**

    a.     *Classification:* Class 6 consists of all General Unsecured Claims. This Class includes every Unsecured Claim against the RCB (including, but not limited to, every such Claim arising from the rejection of an Executory Contract and every Claim which is the undersecured portion of any Secured Claim), which is not (1) an unclassified claim or (2) classified in any other Class under the Plan.

    b.     *Treatment:* Every Creditor holding a Class 6 Claim, as and when such Class 6 Claim is or becomes an Allowed General Unsecured Claim, will be paid in Cash 50% of the Allowed General Unsecured Claim, without regard to any Penalty Claims, on the later of the Effective Date or the Claim Payment Date in full satisfaction, settlement and release of such Claim.

    c.     *Voting:* Class 6 is impaired and holders of Allowed Class 6 Claims are entitled to vote under the Plan.

**7.**     **Class 7 – Claim of F & M Bank**

    a.     *Classification:* Class 7 consists of the Claim of F & M Bank.

    b.     *Treatment:* The Reorganized Debtor will pay the portion of the Class 7 Claim that is based on the RCB Loan, as modified herein, and will continue to be a guarantor for the portion of the Class 7 Claim that is based on the RCW Loan, as modified by F & M Bank and RCW and consented to by the Reorganized Debtor herein. The maturity dates of both the RCB and RCW Loans will be extended from April 15, 2020, to five years from the Effective Date, however, the term of the amortization schedule shall remain unchanged. The annual fixed rate of interest for both the RCB and RCW Loans will be lowered from 4.25% to 3.25%. F & M Bank will waive all legal fees incurred in connection with the Debtor's bankruptcy case. RCW and/or the Reorganized Debtor will pay a loan extension/modification fee of 0.5% of the outstanding principal balance of both the RCB and RCW loans as of the Confirmation Date as well as a processing/documentation fee of $500 for both the RCB and RCW Loans. RCW agrees to pay up to $11,550.00 to F&M Bank for appraisals of RCW's properties that constitute its collateral. RCB agrees to release the restrictive covenants, conditions and

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

restrictions that it has upon the real properties, owned by RCW, that constitute F&M Bank's collateral. The Reorganized Debtor, RCW and F&M Bank will agree to loan modification documents prior to the Confirmation Date the terms of which shall govern. F & M Bank shall withdraw its proof of claim number 87.

        c.    *Voting:* Class 7 is impaired and the holder of the Allowed Class 7 Claim may vote to accept or reject the Plan.

        **8.**      **Class 8 – Claim of RCW**

        a.    *Classification:* Class 8 consists of the Claim of RCW.

        b.    *Treatment:* RCW will not receive any payments on account of its Class 8 Claim until the Trust has been funded and the Unknown Tort Claims Fund Note is paid in full. The RCW Claim will be paid 50% of the Allowed Amount of the RCW Claim, without regard to any Penalty Claims, in quarterly installments without interest, commencing on the later of January 1, 2018, or the first (1st) day of the quarter after the Unknown Tort Claims Fund Note is paid in full and continuing on the first (1st) day of each quarter thereafter until paid in full as provided herein, unless otherwise agreed.

        c.    *Voting:* Class 8 is impaired and the holder of the Allowed Class 8 Claim may vote to accept or reject the Plan.

        **9.**      **Class 9 – Priest Retirement Claims**

        a.    *Classification:* Class 9 consists of all Priest Retirement Claims. This Class includes the legal, equitable and contractual rights of any individual arising under the Priest Rabbi Trust Pension Plan and/or the Qualified Priest Pension Plan, as shown in the proof of claim numbers set forth on Schedule 3.95 to the Plan.

        b.    *Treatment:* Class 9 Priest Retirement Claims will not be paid any amounts from the Priest Rabbi Trust Pension Plan. Each holder of a Class 9 Priest Retirement Claim shall be paid by the Reorganized Debtor in accordance with the Qualified Priest Pension Plan, as it may be amended from time to time or as it may be replaced by another retirement plan. To the extent the holder of a Priest Retirement Claim does not qualify as a participant under the Qualified Priest Pension Plan, such claimant will receive no distribution on account of his Priest

Retirement Claim.

c.     *Voting:*  Class 9 is impaired and holders of Allowed Class 9 Claims may vote to accept or reject the Plan.

**10.     Class 10 – Extern Priest Claims**

a.     *Classification:*  Class 10 consists of all Extern Priest Claims.  This Class is defined to include any Claim of an extern priest for retirement benefits held by the Debtor in trust for extern priests as represented by Claim Nos. 31, 32, 33, 41, 43, 52, 67, 68, 81, 82, 91, 93, 96 and 113, as well as the scheduled Claim of Fr. Jose Mario Guarin in the amount of $2,708.34.  Such funds are not property of the Debtor's Estate.

b.     *Treatment:*  The Plan leaves the legal, equitable and contractual rights of Extern Priest Claims unaltered.  Allowed Extern Priest Claims will be paid in accordance with the RCB's priest compensation policy from funds held in trust for such purpose by the Debtor or Reorganized Debtor.  No holder of an Allowed Extern Priest Claim will receive any Cash on account of such Claim on the Effective Date except to the extent that a holder of an Allowed Extern Priest Claim is entitled to a Cash payment in accordance with the RCB's priest compensation policy.

c.     *Voting:*  Class 10 is unimpaired and holders of Allowed Class 10 Claims are not entitled to vote under the Plan.

**11.     Class 11 – Other Tort Claims**

a.     *Classification:*  Class 11 consists of all Other Tort Claims.  This Class includes any and all Claims, demands, suits, causes of action, proceedings or any other rights or asserted rights to payment heretofore, now or hereafter asserted against the Debtor, whether or not reduced to judgment, for property damage, liability or workers compensation for which the Debtor is or may be liable (directly or indirectly), whether arising from tort, contract, employment law, violations of wage and hour laws, or workers compensation or for which there is Insurance Coverage, including but not limited to, any Claim for which the Debtor has a self-insured retention, but excluding Tort Claims, Unknown Tort Claims, any Priority Employee Unsecured Claim, any Administrative Claims, and any Non-Priority Employee Claim.

b.    *Treatment:*  Each holder of a Class 11 Other Tort Claim, as and when such Claim becomes an Allowed Claim, will be paid solely from any Insurance Policies applicable to such Other Tort Claim; provided, however, neither the Reorganized Debtor nor any Insurer shall be responsible for any amount attributable to a self-insured deductible.  To the extent that such Claims may not be satisfied in full pursuant to the applicable Insurance Policies or if such Insurance Policies have been sold and released pursuant to the applicable Insurance Policy, Participating Party Agreement or Insurance Settlement Agreement, then such Other Tort Claims, to the extent not so satisfied, will be a Disallowed Claim.

c.    *Voting:*  Class 11 is impaired and holders of Allowed Class 11 Claims may vote to accept or reject the Plan.

**12.    Class 12 – Tort Claims A**

a.    *Classification:*  Class 12 consists of each of the following Tort Claims:  Tort Claim Nos. 131, 136, 140 and 141.  These claims (a) appear timely and properly filed on their face, (b) are for Abuse occurring or beginning while the Tort Claimant was a minor, (c) are not the separately settled Tort Claim C, and (d) present on the face of the proof of claim, or in the pleadings of any lawsuit referenced in the proof of claim, and/or through post-Petition Date allegations a credible argument that the claim is not barred by the statute of limitations.

Such credibility generally refers to either (i) the proof of claim revealing that the Tort Claimant had not reached the age of 26 before the earlier of its filing suit against the Debtor or the Petition Date (January 15, 2014) or (ii) such claim both meeting any of the following criteria and the Debtor or Committee having had some indication that the Tort Claimant is prepared to so demonstrate:  (1) the Tort Claimant was born after January 1, 1977 and is alleging under California Code of Civil Procedure 340.1 that the suit was due to either or both (x) delayed discovery (that psychological injury or illness occurring after the age of majority was caused by Abuse), or (y) the failure of a defendant to take or implement reasonable steps or safeguards (to avoid future acts of Abuse); or (2) the Debtor and/or other parties against whom the claim is alleged are alleged to be prevented from asserting a statute of limitations defense due to equitable estoppel.

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

Except as otherwise ordered by the Court prior to the conclusion of the Confirmation Hearing, this term also refers to and means any Tort Claims listed in the definition of Tort Claim B as to which the following applies:  (A) the Tort Claimant files, in response to the notice for approval of the Disclosure Statement, an objection to classification;  (B) such objection contains sufficient evidence and argument for the subject Tort Claim to (I) prove that such Tort Claim was timely and properly filed, (II) demonstrate that such Tort Claim is for Abuse occurring or beginning while the Tort Claimant was a minor, and (III) defeat an objection to such Tort Claim based on the applicable state law statute of limitations defense; and (C) prior to approval of the Disclosure Statement, the Court so finds for the Tort Claimant as to clauses (A) and (B)(I) through (III) of this sentence, and sustains such Tort Claimant's classification objection.

The Tort Claims A of holders of such Claims include any and all of such holders' Claims, including Penalty Claims, any Claims for attorneys' fees and other expenses, fees or costs, or requests for any equitable remedy, asserted against the Debtor, any Protected Parties, the Trustee, or the Trust, and in each case, related to bodily injuries, personal injuries or death, including emotional distress, mental distress, mental anguish, shock or humiliation originating with, based on, caused by or in any way related to:

(i)      Acts of Abuse occurring prior to the Petition Date including such acts committed by any cleric, employee, volunteer, agent, contractor or other Entity associated with the Diocese Parties, any Parish or any affiliated or related Entity within the territory of the Diocese;

(ii)      With respect to Claims based upon or relating in any way to Abuse, the failure to properly hire, install and/or supervise prior to the Petition Date any cleric, any volunteer, or any other employee, agent or contractor of, or Entity associated with, the Diocese Parties, a Parish or any affiliated or related Entity within the territory of the Diocese;

(iii)      The processing, adjustment, defense, settlement, payment, negotiation or handling of any Claims, based upon or relating in any way to Claims made as a result of any Abuse occurring prior to the Petition Date asserted by a Tort Claimant related to or within the territory of the Diocese;

(iv)     The failure to warn, disclose, investigate, detect, report, prevent, remedy, or provide information concerning either the Abuse or other misconduct related to Abuse occurring prior to the Petition Date of clergy, employees, volunteers, agents or contractors of Entities associated with the Diocese Parties, the Parishes or any affiliated or related Entities within the territory of the Diocese;

(v)     The failure to provide medical, psychological or other care, counseling or treatment to victims or relatives of victims of Abuse occurring prior to the Petition Date; or

(vi)     Any other acts or omissions related to Abuse occurring prior to the Petition Date.

b.     *Treatment*

(i)     On the Effective Date, the Trust shall assume all liability for, and the Trust will pay, each and every Tort Claim A as Class 12 Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, Tort Claims A Allocation Protocol, and Trust Documents.

(ii)     The Initial Allocation of the Tort Claims Settlement Amount for Class 12 Claims is Thirteen Million Dollars ($13,000,000), which amount is (1) subject to increase as a result of the Tort Settlement Amount Additions Allocation, and Objection Reallocation and (2) subject to reduction by the Trustee for, *inter alia*, expenses of administering the Trust, paying the Trustee and Abuse Claims Reviewer, and paying Qualified Counsel Fees.

(iii)     Tort Claimants shall have their Class 12 Claims treated pursuant to the Tort Claims A Allocation Protocol, including review of such Tort Claims by the Abuse Claims Reviewer in accordance with the Tort Claims A Allocation Protocol. **Upon the occurrence of the Effective Date, no Tort Claimant shall have the right to a trial by jury or otherwise with respect to any Tort Claim against the Trust and the Tort Claim A of such Tort Claimant will be solely determined by the Abuse Claims Reviewer in accordance with the Tort Claims A Allocation Protocol, and shall be a Channeled Claim to be paid solely**

**from the Trust.**

(iv)     Debtor, the Reorganized Debtor and their counsel shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee as requested by the Abuse Claims Reviewer or the Trustee, but only in connection with any reasonable inquiries by either in the administration of the Allocation Protocols, in respect of Tort Claims or with respect to Assets assigned to the Trust or Trustee.

(v)     No Tort Claimant may challenge the merit, validity, or amount of any Class 12 Claim.

(vi)     Funding of the Tort Claim Settlement Amount is being enabled by contributions from Settling Insurers and Participating Parties based in substantial part on their receiving certain written releases of Claims against all of the Protected Parties and certain certifications. Execution of such written releases and certifications by the Tort Claimants holding Class 12 Claims is a condition to the Plan's Effective Date and to such Tort Claimants being entitled to be considered for an Award from the Abuse Claims Reviewer made in accordance with the Tort Claims A Allocation Protocol. Execution of the release and certification included in the Class 12 Ballot for voting on the Plan by a Tort Claimant holding a Class 12 Claim is sufficient for this purpose or, alternatively, such Tort Claimant must personally (unless deceased or lacking capacity) execute a separate release and certification in substantially similar form thereto. The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

(vii)     **Regardless of the amount(s) to which a holder of a Tort Claim A may receive under the Plan from the Trust, such Tort Claimant shall have no rights against the Reorganized Debtor, the Insured Entities or the Protected Parties relating to such Tort Claim, and such Tort Claim shall be discharged and subject to the Injunctions as provided in the Plan.**

(viii)     Before any payment(s) is made to or calculated for Tort Claimants on account of a Tort Claim A, the Trustee will subtract all related Qualified Counsel Fees from the balance of the Trust Assets in the subaccount established for Tort Claims A in an

amount equal to: (a) the total fees payable to applicable Qualified Counsel by the subject Tort Claimants based on the reserves or distributions for such Tort Claimants calculated under the Plan and the Tort Claims A Allocation Protocol; and (b) an amount equal to the unpaid reimbursable expenses (prepetition and postpetition through the Effective Date) payable to such Qualified Counsel by the beneficiaries of the subaccount of the Trust established for Tort Claims A. The Trust shall pay such fees to such Qualified Counsel as and when the applicable Tort Claimant receives a distribution from the Trust.

(ix)     Subject to the treatment of Qualified Counsel Fees pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive payments from the Trust will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. The Reorganized Debtor and the Protected Parties shall not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants or for any Qualified Counsel Fees. The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions herein relating to Qualified Counsel Fees.

(x)     No payment or Award will be made to any Tort Claimants holding Tort Claims A asserting Penalty Claims relating to such Tort Claims and such Penalty Claims will be Disallowed Claims.

(xi)     If the Unknown Tort Claims Fund is not fully utilized, holders of Tort Claims A also may receive the benefit of the Unknown Tort Claims Fund Reallocation and Distribution.

(xii)     A Tort Claimant may withdraw a Tort Claim A at any time, without further order of the Court, on written notice to the Trustee. If withdrawn, (a) the Tort Claim A will be withdrawn with prejudice and may not be reasserted against the Reorganized Debtor, the Trust, the Trustee, or any Protected Party, including as an Unknown Tort Claim, (b) as a condition to withdrawal of the Tort Claim A, any funds paid to the Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust, and (c) such funds and

any reserve maintained by the Trust on account of such Tort Claim shall revert to the non-reserved assets of the subaccount of the Trust for Class 12 for distribution or use as part of the Class 12 allocation of funds in accordance with the Plan and the Trust.  Withdrawal of any Tort Claim A by a Tort Claimant shall be without prejudice to such Entity's rights against any Co-Defendant but subject to the limitations contained in the Plan and the Confirmation Order.

c.      *Voting:*   Class 12 is impaired and holders of Allowed Class 12 Claims may vote to accept or reject the Plan.

### 13.      Class 13 – Tort Claims B

a.      *Classification:*   Class 13 consists of each of the following Tort Claims:  Tort Claim Nos. 100, 103, 104, 105, 119, 121, 123, 124, 125, 128 (as amended by Claim No. 152), 132, 134 (as amended by Claim No. 150), 135, 137, 138, 139, 142, 143, 144, 145, 147, 148 and 149.  These are Tort Claims that do not fit within the definitions of Tort Claim A, Tort Claim C or Unknown Tort Claims.  Besides not being Tort Claim C or Unknown Tort Claims, these Tort Claims generally then (a) do not appear timely or properly filed on their face, or (b) are not for Abuse occurring or beginning while the Tort Claimant was a minor, or (c) do not present on the face of the proof of claim, in the pleadings of any lawsuit referenced in the proof of claim, or through post-Petition Date allegations a credible argument that the claim is not barred by the statute of limitations.

Nonetheless, except as otherwise ordered by the Court prior to the conclusion of the Confirmation Hearing, this term will not refer to any of such Tort Claims listed above in this section as to which the following applies:  (i) the Tort Claimant files, in response to the notice for approval of the Disclosure Statement, an objection to classification;  (ii) such objection contains sufficient evidence and argument for the subject Tort Claim to (1) prove that such Tort Claim was timely and properly filed, (2) demonstrate that such Tort Claim is for Abuse occurring or beginning while the Tort Claimant was a minor, and (3) defeat an objection to such Tort Claim based on the applicable state law statute of limitations defense; and (iii) prior to approval of the Disclosure Statement, the Court so finds for the Tort Claimant as to clauses (i) and (ii)(1) through (3) of this sentence, and sustains such Tort Claimant's classification objection.  Such Tort Claim,

as to which all of the preceding (i), (ii) and (iii) of this paragraph apply, shall be a Tort Claim A.

The Tort Claims B of holders of such Claims include any and all of such holders' Claims, including Penalty Claims, any Claims for attorneys' fees and other expenses, fees or costs, or requests for any equitable remedy, asserted against the Debtor, any Protected Parties, the Trustee, or the Trust, and in each case, related to bodily injuries, personal injuries or death, including emotional distress, mental distress, mental anguish, shock or humiliation originating with, based on, caused by or in any way related to:

(i)　　　Acts of Abuse occurring prior to the Petition Date including such acts committed by any cleric, employee, volunteer, agent, contractor or other Entity associated with the Diocese Parties, any Parish or any affiliated or related Entity within the territory of the Diocese;

(ii)　　　With respect to Claims based upon or relating in any way to Abuse, the failure to properly hire, install and/or supervise prior to the Petition Date any cleric, any volunteer, or any other employee, agent or contractor of, or Entity associated with, the Diocese Parties, a Parish or any affiliated or related Entity within the territory of the Diocese;

(iii)　　　The processing, adjustment, defense, settlement, payment, negotiation or handling of any Claims, based upon or relating in any way to Claims made as a result of any Abuse occurring prior to the Petition Date asserted by a Tort Claimant related to or within the territory of the Diocese;

(iv)　　　The failure to warn, disclose, investigate, detect, report, prevent, remedy, or provide information concerning either the Abuse or other misconduct related to Abuse occurring prior to the Petition Date of clergy, employees, volunteers, agents or contractors of Entities associated with the Diocese Parties, the Parishes or any affiliated or related Entities within the territory of the Diocese;

(v)　　　The failure to provide medical, psychological or other care, counseling or treatment to victims or relatives of victims of Abuse occurring prior to the Petition Date; or

(vi)　　　Any other acts or omissions related to Abuse occurring prior

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

to the Petition Date.

                b.     *Treatment*

                (i)     On the Effective Date, the Trust shall assume all liability for, and the Trust will pay, as Class 13 Claims pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, Tort Claims B Allocation Protocol and Trust Documents, each and every Tort Claim B that is not Disallowed in accordance with the Plan.

                (ii)     The Initial Allocation of the Tort Claims Settlement Amount for Class 13 Claims is Five Hundred Thousand Dollars ($500,000), which amount is (1) subject to increase as a result of the Tort Settlement Amount Additions Allocation and (2) subject to reduction based on the Objection Reallocation and by the Trustee for, *inter alia*, expenses of administering the Trust, paying the Trustee and Abuse Claims Reviewer, and paying Qualified Counsel Fees.

                (iii)     Tort Claimants shall have their Class 13 Claims treated pursuant to the Tort Claims B Allocation Protocol, including review of such Tort Claims by the Abuse Claims Reviewer in accordance with the Tort Claims B Allocation Protocol. **Upon the occurrence of the Effective Date, no Tort Claimant shall have the right to a trial by jury or otherwise with respect to any Tort Claim against the Trust and the Tort Claim B of such Tort Claimant will be solely determined by the Abuse Claims Reviewer in accordance with the Tort Claims B Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust.**

                (iv)     Debtor, the Reorganized Debtor and their counsel shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee as requested by the Abuse Claims Reviewer or the Trustee, but only in connection with any reasonable inquiries by either in the administration of the Allocation Protocols, in respect of Tort Claims or with respect to Assets assigned to the Trust or Trustee.

                (v)     No Tort Claimant may challenge the merit, validity, or amount of any other Class 13 Claim.

                (vi)     Funding of the Tort Claim Settlement Amount is being

enabled by contributions from Settling Insurers and Participating Parties based in substantial part on their receiving certain written releases of Claims against all of the Protected Parties and certain certifications. Tort Claimants holding Class 13 Claims that are not Disallowed who timely execute and deliver such written releases and certifications shall be entitled to be considered for an Award from the Abuse Claims Reviewer in accordance with the Tort Claims B Allocation Protocol. Execution of the release and certifications included in the Class 13 Ballot for voting on the Plan are sufficient for this purpose. By timely executing and delivering such written release and certifications, such Tort Claimant's Award shall be in all events no less than $2,000 so long as the Tort Claimant receives any points at all under such Tort Claim B Allocation Protocol. A Tort Claimant holding a Class 13 Claim that is not Disallowed who does not execute and deliver such release and certifications will receive $100 and no other distribution on account of such Tort Claims B.

(vii) If a Tort Claimant does not timely submit a Ballot with the releases and certifications therein executed, such Tort Claimant will qualify for an Award from the Abuse Claims Reviewer if such Tort Claimant personally (unless deceased or lacking capacity) and timely executes the release and certifications required by Section 22.6 of the Plan. The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request.

(viii) **Regardless of the amount(s) to which a holder of a Tort Claim B may receive under the Plan from the Trust, such Tort Claimant shall have no rights against the Reorganized Debtor, the Insured Entities, or the Protected Parties relating to such Tort Claim B and such Tort Claim B shall be discharged and subject to the Injunctions as provided in the Plan.**

(ix) Before any payment(s) is made to or calculated for Tort Claimants on account of a Tort Claim B, the Trustee will subtract all related Qualified Counsel Fees from the balance of the Trust Assets in the subaccount established for Tort Claims B in an amount equal to: (a) the total fees payable to applicable Qualified Counsel by the subject Tort Claimants based on the reserves or distributions for such Tort Claimants calculated under the Plan

and the Tort Claims B Allocation Protocol; and (b) an amount equal to the unpaid reimbursable expenses (prepetition and postpetition through the Effective Date) payable to such Qualified Counsel by the beneficiaries of the subaccount of the Trust established for Tort Claims B. The Trust shall pay such fees to such Qualified Counsel as and when the applicable Tort Claimant receives a distribution from the Trust.

(x)       Subject to the treatment of Qualified Counsel Fees pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive payments from the Trust will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. The Reorganized Debtor and the Protected Parties shall not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants or for any Qualified Counsel Fees. The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions herein relating to Qualified Counsel Fees.

(xi)      No payment or Award will be made to any Tort Claimants holding Tort Claims B asserting Penalty Claims relating to such Tort Claims B and such Penalty Claims will be Disallowed Claims.

(xii)     If the Unknown Tort Claims Fund is not fully utilized, holders of Tort Claims B also may receive the benefit of the Unknown Tort Claims Fund Reallocation and Distribution.

(xiii)    A Tort Claimant may withdraw a Tort Claim B at any time, without further order of the Court, on written notice to the Trustee. If withdrawn, (a) the Tort Claim B will be withdrawn with prejudice and may not be reasserted against the Reorganized Debtor, the Trustee, the Trust, or any Protected Party, including as an Unknown Tort Claim, (b) as a condition to withdrawal of the Tort Claim B, any funds paid to the Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust, and (c) such funds and any reserve maintained by the Trust on account of such Tort Claim shall revert to the non-reserved assets of the subaccount of the Trust for Class 13 for distribution or use as part of the

Class 13 allocation of funds in accordance with the Plan and the Trust.  Withdrawal of any Tort Claim B by a Tort Claimant shall be without prejudice to such Entity's rights against any Co-Defendant but subject to the limitations contained in the Plan and the Confirmation Order.

c.      *Voting:*  Class 13 is impaired and holders of Allowed Class 13 Claims may vote to accept or reject the Plan.

**14.     Class 14 – Tort Claim C**

a.      *Classification:*  Class 14 consists of Tort Claim No. 130 to which the Debtor entered into a prepetition settlement that is alleged by the Tort Claimant to have included false representations as to the Debtor's ability to pay, which allegations the Debtor disputes, and as to which amounts remain unpaid.

b.      *Treatment*

(i)      On the Effective Date, the Trust shall assume all liability for and the Trust will pay the Tort Claim C as a Class 14 Claim pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, and Trust Documents.

(ii)      The Initial Allocation of the Tort Claims Settlement Amount for Class 14 Claims is Seven Hundred Fifty-Thousand Dollars ($750,000), which shall be paid to the Class 14 Claimant from the Trust promptly after the Effective Date, as and subject to Article 20 of the Plan.

(iii)      **Upon the occurrence of the Effective Date, the Class 14 Tort Claimant shall have no right to a trial by jury or otherwise with respect to any Tort Claim against the Trust and the Tort Claim C of the Tort Claimant will be solely treated in accordance with the Plan, and shall be a Channeled Claim to be paid solely from the Trust.**

(iv)      Debtor, the Reorganized Debtor and their counsel shall reasonably cooperate with the Trustee as requested by the Trustee, but only in connection with any reasonable inquiries by either in the administration of the Allocation Protocols, in respect of Tort Claims or with respect to Assets assigned to the Trust or Trustee.

(v)      No other Tort Claimant may challenge the merit, validity, or amount of the Class 14 Claim.  If any objection to the Class 14 Claim is pending as of the

Effective Date, such objection is deemed withdrawn with prejudice on or after the Effective Date. No objection shall be made to the Class 14 Claim, which is being settled under the Plan.

(vi)     Funding of the Tort Claim Settlement Amount is being enabled by contributions from Settling Insurers and Participating Parties based in substantial part on their receiving certain written releases of Claims against all of the Protected Parties and certain certifications. Execution of such written releases and certifications by the Tort Claimant holding the Class 14 Claim is a condition to the Plan's Effective Date and to such Tort Claimant receiving a distribution under the Plan. Execution of the release and certification included in the Class 14 Ballot for voting on the Plan by a Tort Claimant holding a Class 14 Claim is sufficient for this purpose or, alternatively, such Tort Claimant must personally (unless deceased or lacking capacity) execute a separate release and certification in substantially similar form thereto. The Trust shall be obligated to provide copies of the Tort Claimant's release and certifications to any of the Protected Parties upon request.

(vii)     **Regardless of the amount(s) to which the holder of Tort Claim C may receive under the Plan from the Trust, such Tort Claimant shall have no rights against the Reorganized Debtor, the Insured Entities or the Protected Parties relating to such Tort Claim C, and such Tort Claim C shall be discharged and subject to the Injunctions as provided in the Plan.**

(viii)     The Class 14 Tort Claim was settled prior to the Petition Date under a settlement that is alleged to include false representations of the Debtor, which allegations the Debtor disputes, and as to which the Debtor's performance was incomplete as of the Petition Date. The Initial Allocation of the Tort Claims Settlement Amount for Class 14 Claim is made in full settlement of such Claim, including any rights to rescission or for damages for the underlying Abuse, and all other Claims of the Class 14 Tort Claimant.

c.     *Voting:* Class 14 is impaired and holders of Allowed Class 14 Claims may vote to accept or reject the Plan.

**15.     Class 15 – Unknown Tort Claims**

a.     *Classification:* Class 15 consists of all Unknown Tort Claims.

b.     *Definition*:    Class 15 includes any Tort Claim for which (a) no proof of Claim is filed or deemed filed on or before the Bar Date by a Tort Claimant (as opposed to the proof of Claim filed by the Future Claims Representative); and (b) a proof of Claim is filed or submitted after the Bar Date in accordance with the procedures set forth in the Plan, the Confirmation Order and the Unknown Tort Claim Allocation Protocol, if the Entity asserting the Tort Claim:

      (i)      Knew that he or she had an incident of Abuse for which the Debtor is alleged to be liable while such Tort Claimant was a minor, yet, prior to the May 9, 2014 Tort Claim Bar Date Notice Date failed to make the connection between such incident and injuries arising therefrom such that the applicable state law limitations period would not have expired prior to the Tort Claim Bar Date;

      (ii)      Had repressed memory, prior to the May 9, 2014 Tort Claim Bar Date Notice Date, that, as a minor, he or she had an incident of Abuse; or

      (iii)      Had not reached the age of twenty-six (26) prior to the May 9, 2014 Tort Claim Bar Date Notice Date.

      (iv)      With respect to (i) – (iii) above, the application or interpretation of any such provisions to any Tort Claim shall be performed solely by the Abuse Claims Reviewer.

c.     *Treatment:*

      (i)      On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Unknown Tort Claims from the Unknown Tort Claims Fund pursuant to the provisions of the Plan, Plan Documents, Confirmation Order, Unknown Tort Claim Allocation Protocol and Trust Documents. The Unknown Tort Claims Fund Note, the Unknown Tort Claims Fund, and any increase to the Initial Allocation for Class 15 payable as a result of the Tort Claims Settlement Amount Additions Allocation shall be the sole sources of funding distributions on account of Unknown Tort Claims entitled to an Award pursuant to the Unknown Tort Claims Allocation Protocol, which funding also shall be sources, *inter alia*, for expenses of administering the Trust and paying the Trustee and Abuse Claims Reviewer. If an Unknown Tort

Claim is paid or denied payment pursuant to the Unknown Tort Claim Allocation Protocol, the holder of such Unknown Tort Claim shall have no further rights against the Debtor, Reorganized Debtor, the Trust, Trustee, Participating Party or Settling Insurers relating to such Unknown Tort Claim.

(ii)     Unknown Tort Claimants shall file proofs of Claim in substantially the form attached as Exhibit 11 to the Plan and shall include information sufficient for the Abuse Claims Reviewer to make an initial evaluation pursuant to the Unknown Tort Claim Allocation Protocol and an evaluation of the Claim pursuant to the evaluation factors in the Unknown Tort Claim Allocation Protocol. Such Unknown Tort Claims shall be filed by submitting the claims to the Trustee at the address provided on the form.

(iii)     Unknown Tort Claimants shall have their Class 15 Claims treated pursuant to the Unknown Tort Claims Allocation Protocol, including review of such Claims by the Abuse Claims Reviewer in accordance with the Unknown Tort Claims Allocation Protocol. **Upon occurrence of the Effective Date, Unknown Tort Claimants shall have no right to a trial by jury or otherwise with respect to any Tort Claim against the Trust and the Tort Claim of such Unknown Tort Claimant will be solely determined by the Abuse Claims Reviewer and in accordance with the Unknown Tort Claims Allocation Protocol, and shall be a Channeled Claim to be paid solely from the Trust.**

(iv)     Debtor, the Reorganized Debtor and their counsel shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee as requested by the Abuse Claims Reviewer or the Trustee, but only in connection with any reasonable inquiries by either in the administration of the Allocation Protocols, in respect of Tort Claims or with respect to Assets assigned to the Trust or Trustee.

(v)     The Trustee shall have the sole and exclusive right to object to an Unknown Tort Claim. The Trustee, however, cannot object to the Abuse Claims Reviewer's acceptance and/or valuation of any Tort Claim and interpretation of the Plan and Unknown Tort Claims Allocation Protocol.

(vi)     If a Tort Claimant holding a Class 15 Claim timely executes

a written release and certification, it shall be entitled to be considered for an Award from the Abuse Claims Reviewer made in accordance with the Unknown Tort Claims Allocation Protocol. The written releases and certifications in the form included in the Class 12 Ballot for voting on the Plan are sufficient for this purpose. An Unknown Tort Claimant must personally (unless deceased or lacking capacity) execute the release and certifications required by Section 21.1(f) of the Plan. The Trust shall be obligated to provide copies of the Tort Claimants' releases and certifications to any of the Protected Parties upon request. Because funding of the Tort Claim Settlement Amount is being enabled by contributions from Settling Insurers and Participating Parties based in substantial part on their receiving certain written releases of Claims against all of the Protected Parties and certain certifications, as agreed by the Future Claims Representative, each of the Tort Claimants holding Class 15 Claims shall receive no distribution from the Trust if the Tort Claimant fails to execute the written releases and certifications (and also shall receive nothing if its Tort Claim is Disallowed).

(vii) **Regardless of the amount(s), if any, to which a holder of an Unknown Tort Claim may receive under the Plan from the Trust, such Tort Claimant will have no rights against the Reorganized Debtor, the Insured Entities or the Protected Parties relating to such Tort Claim, and such Unknown Tort Claim shall be discharged and subject to the Injunctions as provided in the Plan.**

(viii) The fees and expenses of attorneys representing Unknown Tort Claimants who receive payment from the Trust will be borne by such Unknown Tort Claimants based on applicable state law and individual arrangements made between such Unknown Tort Claimants and their respective attorneys. None of the Reorganized Debtor, the Trust, the Trustee, or the Protected Parties will have any liability for any fees and expenses of attorneys representing any Unknown Tort Claimants and any Claims for such fees and expenses will be disallowed.

(ix) No payment or Award will be made to any Unknown Tort Claimants asserting Penalty Claims relating to Unknown Tort Claims and such Penalty Claims will be Disallowed Claims.

(x)     If the Unknown Tort Claims Fund is not fully utilized, any then existing holders of Unknown Tort Claims also may receive the benefit of the Unknown Tort Claims Fund Reallocation and Distribution.

(xi)     An Unknown Tort Claimant may withdraw an Unknown Tort Claim at any time, without further order of the Court, on written notice to the Trustee. If withdrawn, (a) the Unknown Tort Claim will be withdrawn with prejudice and may not be reasserted against the Reorganized Debtor, the Trustee, the Trust, or any Protected Party; (b) as a condition to withdrawal of the Unknown Tort Claim, any funds paid to the Unknown Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust; and (c) such funds and any reserve maintained by the Trust on account of such Unknown Tort Claim shall revert to the non-reserved assets the subaccount of the Trust for Class 15 for distribution or use as part of the Class 15 allocation of funds in accordance with the Plan and the Trust.

(xii)     Withdrawal of any Unknown Tort Claim by an Unknown Tort Claimant shall be without prejudice to such Entity's rights against any Co-Defendant but subject to the limitations contained in the Plan and the Confirmation Order.

d.     *Voting:* Class 15 is impaired and holders of Allowed Class 15 Claims may vote to accept or reject the Plan.

## VIII. MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

### A. Establishment of Plan Implementation Account

After the Confirmation Date, the Debtor will establish the Plan Implementation Account which will be held and administered in accordance with the Plan, the Insurance Settlement Agreement, the Participating Party Agreement and the Confirmation Order. The Plan Implementation Account will include the following:

(1)     Debtor's Funding. The Debtor will transfer $7,400,000 or so much as is necessary to satisfy the Debtor's initial obligations under the Plan to the Plan Implementation Account. A portion of such funding may be obtained through the Cemetery Loan to the Debtor or Reorganized Debtor. After the Confirmation Date, the Debtor may transfer (i) all of the funds held pursuant to the Order Granting Debtor's Motion to Approve Stipulation Regarding

Procedures for Sale of Eucharistic Franciscan Sisters Residence (Dkt. No. 338), and (ii) all of the funds held pursuant to the Order on Debtor's Motion for Order Approving a Stipulation for Turnover of Rabbi Trust Funds and Payment of Post-Petition Plan Expenses (Dkt. No. 316) to the Plan Implementation Account without further Court order.

(2)     Settling Insurers Funding.     Pursuant and subject to the Insurance Settlement Agreement, the Settling Insurers will wire transfer the aggregate sum of $3,305,000 to the Plan Implementation Account.

(3)     Participating Party Funding.     Pursuant and subject to Participating Parties Agreement, the Participating Parties will transfer $2,905,000 to the Plan Implementation Account.

(4)     All Saints Settlement.     Pursuant and subject to the Participating Party Agreement, All Saints University Church will transfer $1,295,000 to the Plan Implementation Account.

(5)     RCW Funding.     Pursuant and subject to the Participating Party Agreement, the RCW will transfer $1,000,000 to the Plan Implementation Account.

**B.     Other Means for Implementing the Plan**

In addition to providing funds to the Plan Implementation Account, on or before the Effective Date, the Debtor will transfer the $750,000 Unknown Tort Claims Fund Note to the Trustee. To the extent necessary to allow the Debtor to satisfy its initial obligations under the Plan, the law firm of Felderstein Fitzgerald Willoughby & Pascuzzi LLP and the law firm of Neumiller & Beardslee APC will consent to defer payment of approximately $445,000 of their Allowed Professional Fee Claims.

**C.     Establishment of Disputed Claims Reserve**

If required, the Debtor shall establish and fund the Disputed Claims Reserve as of the Effective Date.

**D.     Payment and Treatment of Claims Other Than Tort Claims**

Payments due to creditors on account of Allowed Claims other than Tort Claims will be paid pursuant to the terms of the Plan from the Reorganized Debtor's Revested Assets and ongoing operations, except that, unless otherwise agreed, payments for Allowed Professional Fee

Claims also may be paid from any remainder of the funds in the Plan Implementation Account. Additionally, other than as to Professional Fees and transfers due to the Trust or Trustee, any payment due to a creditor under the Plan by a specified Claims Payment Date will not be late if paid within thirty (30) days following such applicable Claim Payment Date.

### E.     Non-Monetary Transfers to the Trust

In addition to other obligations of the Debtor under the Plan with respect to the Trust, including the transfer to the Trust of the Tort Claim Settlement Amount, as of the Effective Date, all rights of the Debtor and Estate to the following shall automatically vest in the Trust and Trustee: (a) all rights to object to Tort Claims; (b) all claims against Tort Claimants, including Avoidance Actions; and (c) all rights and claims of the Debtor, including subrogation Claims, Contribution Claims and claims to available insurance, against a Non-Setting Insurer (and as to the applicable Policy) as to any and all Tort Claims for which the Trust has liability and for which the Reorganized Debtor no longer has liability under the Plan. If any objection to a Class 12, Class 13 or Class 14 Claim is pending as of the Effective Date, such objection is deemed withdrawn with prejudice on or after the Effective Date, except that if an objection to a Class 13 Claim had been brought or authorized by the Committee prior to the Effective Date, it may be taken over from the Debtor or Committee by the Trustee.

### F.     Revesting of Debtor's Property and Retained Claims

Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, all real and personal property of the Debtor shall revest in the Reorganized Debtor, free and clear of all Claims, liens, encumbrances, charges and other interests of Creditors. As of the Effective Date, the Reorganized Debtor may hold, use, dispose, and otherwise deal with its property and conduct its affairs free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court, other than those restrictions and limitations expressly imposed by the Plan, the Confirmation Order and any other Plan Documents.

On or before the Effective Date, all Retained Claims shall be deemed assigned by the Debtor to the Reorganized Debtor. The Reorganized Debtor may pursue any Retained Claims at the discretion of the Reorganized Debtor and will retain the proceeds of all such Retained

Claims, if any.

### G.    Approval of Section 363 Sales, Cemetery Loan and Settlement Agreements in Confirmation Order

On or before the Effective Date, the Court shall have approved under Bankruptcy Code § 363 (i) the sale free and clear of all Tort Claim Interests of any Released Insurance Policies to be purchased by a Settling Insurer pursuant to the terms of the Insurance Settlement Agreement, and (ii) the sale of any property to be purchased by a Participating Party under the Participating Party Agreement.  The Court shall have granted the purchasers the protections available under Bankruptcy Code § 363(m).  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Bankruptcy Code § 363 sales free and clear of Tort Claim Interests and grant of Bankruptcy Code § 363(m) protections, as provided in the Insurance Settlement Agreement and Participating Party Agreement.

On or before the Effective Date, the Court shall have approved the financing under Bankruptcy Code § 364 that the Debtor or Reorganized Debtor may receive from Catholic Cemeteries of the Diocese of Stockton.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Bankruptcy Code § 364 financing.

Additionally, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the various compromises and settlements contained in the Plan and shall constitute a determination that such compromises and settlements are in the best interests of the Debtor, the Estate, Participating Parties, Tort Claimants, Unknown Tort Claimants and other parties in interest, and are fair, equitable and within the range of reasonableness.

### H.    Debtor Waiver and Release of Claims Against Settling Insurers

As provided in the Insurance Settlement Agreement, upon the occurrence of the Effective Date and payment by each Settling Insurer of such Settling Insurer's settlement amount pursuant to the Insurance Settlement Agreement, the Debtor on behalf of itself, its Estate, and its Representatives fully, finally, and completely remises, releases, acquits, and forever discharges and releases the corresponding Settling Insurer (and any property thereof) and any of its reinsurers or retrocessionaires from any and all past or present Tort Claims, including any Claims

that, directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims, including Channeled Claims and any Claims related to Abuse occurring after the Petition Date through the Confirmation Date. This release specifically includes all Unknown Tort Claims, with all Tort Claims channeled to the Trust, pursuant to the Plan, and with no liability to such Settling Insurer. If there is any conflict between the Insurance Settlement Agreement and the Plan (including the foregoing release), the terms of the Insurance Settlement Agreement shall prevail as to matters between the parties to, and any third party beneficiaries of, the Insurance Settlement Agreement.

**I.**      **Debtor Waiver and Release of Participating Parties and Settling Insurers**

In consideration of the terms of the Participating Party Agreement, the Insurance Settlement Agreement and other consideration, upon the Effective Date and the respective Participating Party's or Settling Insurer's performance under their respective Participating Party Agreement or Insurance Settlement Agreement, including without limitation delivery of any dismissal orders or stipulations that may be required thereunder, the Debtor, on behalf of itself, its Estate, and its Representatives, fully, finally, and completely remises, releases, acquits, and forever discharges and releases each such Participating Party and each such Settling Insurer and any of their reinsurers or retrocessionaires (and any property thereof) from any and all past and present Claims that arise out of, or relate to, or are in connection with Tort Claims, including any Channeled Claims and any Claims related to Abuse occurring after the Petition Date through the Confirmation Date. This release specifically includes all Unknown Tort Claims, with all Tort Claims channeled to the Trust, pursuant to the Plan, and with no liability to such Settling Insurer. If there is any conflict between the Insurance Settlement Agreement or Participating Party Agreement and the Plan (including the foregoing release), the terms of the applicable Insurance Settlement Agreement or Participating Party Agreement shall prevail as to matters between the parties to, and any third party beneficiaries of, the Insurance Settlement Agreement or Participating Party Agreement, as applicable.

///

///

**J.　　Time for Return and Effect of Late Return of Releases and Certifications by Releasing Tort Claimants**

A Tort Claimant must timely execute a release and certification in accordance with the Plan to be entitled to receive an Award from the Abuse Claims Reviewer based upon its point award. Timely return of a release and certification consists of: (a) execution and return thereof by a Tort Claimant with its timely Ballot; and (b) execution and return thereof in accordance with section 22.6(a)(ii) of the Plan. If a known Tort Claimant fails to return a properly executed release and certification timely, the Trustee shall notify the Reorganized Debtor within ten (10) Business Days of the last day for the Tort Claimant to deliver a timely release and certification. The Reorganized Debtor may commence such action(s) as the Reorganized Debtor deems appropriate to obtain an executed release and certification and notify the Trustee of such undertaking, and a properly executed release and certification obtained as a result shall be timely if obtained within the timeframes set forth in the Plan.

**K.　　Non-Monetary Commitment to Healing and Reconciliation**

In order to further promote healing and reconciliation, and in order to continue its efforts to prevent Abuse from occurring in the Diocese in the future, the Reorganized Debtor agrees that beginning within thirty (30) days after the Effective Date (unless a different date is provided below), it will undertake the commitments set forth in Exhibit 12 attached to and incorporated into the Plan.

**L.　　Procedure for Determination of Claims Other Than Tort Claims**

While Sections 22.10 and 23.7 of the Plan address matters and procedures for objections to Tort Claims, the following procedures will be used for purposes of allowance and disallowance of Claims that are not Tort Claims:

1.　　Objections to Claims. Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date or as expressly provided otherwise in the Plan or a Plan Document, the Reorganized Debtor may object to the allowance of any Claim against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing the appropriate pleading in the Bankruptcy Court at any time

prior to the first Business Day which is one hundred eighty (180) days after the Effective Date, or such other date as may be approved by the Bankruptcy Court; provided, however, that nothing contained in the Plan will affect the right of the Debtor or Reorganized Debtor to seek estimation of any Claims, including Tort Claims, on any grounds permitted by the Bankruptcy Code at any time.

2.　　Disputed Claims.　No payments or other distributions will be made to holders of Disputed Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.　If a Disputed Claim is not an Allowed Claim by the Effective Date, or when payment is otherwise due under the Plan, payment on the Allowed Claim (plus interest, if any, as provided for in the Plan) will commence on the Claim Payment Date.

3.　　Treatment of Contingent Claims.　Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan. The holder of a Contingent Claim will only be entitled to a distribution under the Plan when and if such Contingent Claim becomes an Allowed Claim, subject, however, to the provisions of Bankruptcy Code § 502(e), and, provided that if such Contingent Claim is for reimbursement, indemnification or contribution at the time of allowance or disallowance, it will be disallowed pursuant to Bankruptcy Code § 502(e)(1)(B).

4.　　Disallowance of Claims.　**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM (NOT INCLUDING CLASS 12, CLASS 13, CLASS 14 OR CLASS 15 CLAIMS) FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS UNDER THE PLAN, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT OR AS AGREED TO BY THE REORGANIZED DEBTOR.**

5.     <u>Amendments to Claims</u>.   On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtor, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, provided, that, after the Effective Date, holders of Claims may provide updated notice and address information for distribution purposes, which should be directed to the Reorganized Debtor for all Claims other than Tort Claims, for which such information should be sent to the Trustee.

**M.     <u>Payments Effective Upon Tender</u>**

Whenever the Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Debtor or the Reorganized Debtor to the Creditor to whom payment is due.  If any Creditor refuses a tender, the amount tendered and refused will be held by the Debtor or the Reorganized Debtor for the benefit of that Creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the Creditor, if the Debtor or the Reorganized Debtor failed to pay the tendered payment.

**N.     <u>Preservation of Tort Claimant's Rights Against Co-Defendants</u>**

Nothing in the Plan is intended to affect, diminish or impair any Tort Claimant's rights against any Co-Defendant, but solely with respect to any direct liability of such Co-Defendant. Under no circumstances will the reservation of such Tort Claimant's rights against any Co-Defendant impair the releases, discharge or Injunctions with respect to any Protected Party and the Reorganized Debtor against whom all such rights and/or Claims of any Tort Claimant shall be and are hereby released and enjoined to the extent provided in Article 30 of the Plan.

**O.     <u>Preservation of Debtor's Claims, Demands and Causes of Action</u>**

Except as otherwise provided in the Plan, all Claims, demands, and causes of action of

any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate against any other Entity, including but not limited to, the Retained Claims arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, are hereby preserved in full for the benefit of the Reorganized Debtor, except for such Claims or causes of action, cross-claims, and counterclaims which:  (a) have been released in the Plan or pursuant to any applicable Insurance Settlement Agreement, Participating Party Agreement or a Final Order prior to the Effective Date; and (b) have been or are being transferred to the Trustee.  Claims or causes of action, cross-claims and counterclaims which are being transferred to the Trustee, if any, are preserved under the Plan for the benefit of the Trust.  To the extent necessary, the Reorganized Debtor is designated under the Plan as the estate representative pursuant to, and in accordance with, Bankruptcy Code § 1123(b)(3)(B).  Furthermore, in accordance with Bankruptcy Code § 1123(b)(3), after the Effective Date, the Reorganized Debtor will own and retain, and may prosecute, enforce, compromise, settle, release, or otherwise dispose of, any and all Claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtor or its Estate, including, but not limited to the Retained Claims.  The Debtor and the Reorganized Debtor also will be entitled to assign their rights under the Plan (except to the extent they are prohibited from doing so pursuant to the express terms of any applicable agreement for Insurance Coverage or Participating Party Agreement).  On the Effective Date, and except as otherwise specifically provided in the Plan, the Trustee is designated under the Plan as the estate representative, pursuant to and in accordance with, Bankruptcy Code § 1123(b)(3) with respect to any and all Claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtor or its Estate with respect to Tort Claims.

**P.    Special Provisions Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's or the Reorganized Debtor's rights and defenses with respect to any unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, holders of any such unimpaired Claims.

///

### Q.    Return of Deposits

To the extent that the Debtor was required to and did pay deposits to any Creditors after the Petition Date as a condition of or as security for continued service after the Petition Date, including, but not limited to, deposits paid to utility companies for adequate assurance of payment pursuant to Bankruptcy Code § 366, then, upon satisfaction of the Claims of such Creditor(s) pursuant to the Plan or if such Creditor did not have any claims against the Debtor, any such deposits, together with any interest or other income earned thereon, if any, will be refunded to the Reorganized Debtor within fifteen (15) days of demand by the Reorganized Debtor for return of such deposit(s).

### R.    Delivery of Distributions (Except to Tort Claimants)

Distributions will be made by the Debtor or the Reorganized Debtor as follows:

1.    At the addresses set forth in the proofs of Claim (and if both a claimant's address and a claimant's counsel are listed on the proof of Claim then to counsel's address) filed by holders of Claims or the last known addresses of such holders if no proof of Claim is filed or if neither the Debtor nor the Reorganized Debtor has been notified of a change of address;

2.    At the addresses set forth in written notices of address change filed with the Bankruptcy Court and served on the Debtor or the Reorganized Debtor after the date of any related proof of Claim; or

3.    At the addresses reflected in the Schedules filed in the Reorganization Case if no proof of Claim has been filed and neither the Debtor nor the Reorganized Debtor has been served with a written notice of change of address.

4.    If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder will be made unless and until the Debtor or the Reorganized Debtor is notified of such holder's then-current address, at which time all missed distributions will be made to the holder without interest. All claims for undeliverable or uncashed distributions must be made on or before the first (1st) anniversary of the date applicable to such distribution or with respect to the final distribution to a Creditor holding an Allowed Claim, within ninety (90) days thereof. After such date, all such unclaimed property will revert to the

Reorganized Debtor or the Trustee for further distribution in accordance with the Plan, and the Claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat law to the contrary.

**S.**      **Transmittal of Distributions to Tort Claimants and Unknown Tort Claimants**

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, distributions to Tort Claimants and Unknown Tort Claimants will be made by the Trustee and distributions to all other creditors will be made by the Reorganized Debtor. Distributions to Tort Claimants and Unknown Tort Claimants will be made in accordance with the Trust Documents, provided that the Bankruptcy Court may issue further order(s) consistent with the Plan facilitating distributions in respect of Claims as to which the holders died during the Case, whether before or after the Effective Date.

**T.**      **Efforts Regarding Absence of Address or Returned Mail**

If a claimant's distribution is not mailed or is mailed but returned to the Reorganized Debtor or Trustee because of the absence of a proper mailing address, the Reorganized Debtor or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such claimant from information generally available to the public and from such party's own records, but shall not be liable to such claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Tort Claimant on account of distributions made to the client trust account of a Tort Claimant's attorney.

**U.**      **Limitation on De Minimis Payments**

The Debtor or the Reorganized Debtor will make no distributions of less than $50 to any Creditor holding an Allowed Claim. If a Creditor holding an Allowed Claim does not receive a distribution due to the provisions of Section 23.27 of the Plan on any date on which a distribution is to be made to Creditors in the same Class as the Creditor being entitled to such de minimis payment, then the Claim (so long as it is an Allowed Claim) will remain eligible for distributions on any subsequent distribution date, subject to the provisions of Section 23.27 of the Plan. In all events, the Creditor holding an Allowed Claim which has not received a distribution on any previous distribution dates because of this provision, will receive such distribution on the date

that final distribution is made to Creditors in the same Class as the Creditor being entitled to such de minimis payment.

## IX.    CONDITIONS PRECEDENT TO EFFECTIVE DATE

### A.    Conditions Precedent

The Effective Date will occur when each of the following conditions have been satisfied or waived in accordance with Section 29.2 of the Plan:

1.    The Bankruptcy Court shall have entered a Final Order or Final Orders approving the Insurance Settlement Agreement and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to the Settling Insurers and consistent with the requirements of the Insurance Settlement Agreement, and no stay of such orders is in effect;

2.    The Bankruptcy Court shall have entered a Final Order or Final Orders approving the Participating Party Agreement and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to the Participating Parties and consistent with the requirements of the Participating Party Agreement, and no stay of such orders is in effect;

3.    All holders of Class 12 Tort Claims A and the holder of the Class 14 Tort Claim C shall have executed the releases and certifications described in, respectively, Article 18 and Article 20 of the Plan.

4.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance that is reasonably acceptable to the Reorganized Debtor, the Committee, the Settling Insurers, the Participating Parties and the Confirmation Order is a Final Order;

5.    The Trustee and the Reorganized Debtor have signed the Trust Agreement;

6.    The Debtor shall have received all funding set forth in Section 23.2 of the Plan;

7.    The Debtor shall have paid to the Trust the sum of $14,250,000 from the Plan Implementation Account in accordance with Section 22.2 of the Plan; and

8.    The Debtor shall have delivered the Unknown Tort Claims Fund Note to the Trustee.

**B.** **Waiver of Conditions**

Any condition set forth in Section 29.1 of the Plan may be waived by the mutual written consent of all of (a) the Debtor; (b) the Committee; (c) each Settling Insurer listed on Exhibit 5 to the Plan with respect to any conditions affecting such Settling Insurer's rights and obligations; and (d) each Participating Party listed on Exhibit 3 to the Plan with respect to any conditions affecting such Participating Party's rights and obligations.

**C.** **Non-Occurrence of Effective Date; Effect**

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of the Confirmation Order (as a Final Order) or the Final Order approving the Insurance Settlement Agreement or Participating Party Agreement (as the case may be), the Plan shall become null and void unless agreed otherwise by all of the Debtor, the Committee, the Settling Insurers and the Participating Parties. A statement shall be filed with the Court within three (3) Business Days after the occurrence of any event that renders the Plan null and void. If the Plan becomes null and void, nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against the Debtor; (b) prejudice in any manner the rights of the Debtor, Diocese Parties, Settling Insurers, Participating Parties, the Committee or creditors; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, Diocese Parties, Settling Insurers, Participating Parties, the Committee or creditors in any respect.

**D.** **Merger; Choice of Law**

All obligations of the Debtor to all Creditors will be merged into the Plan, the Trust, the Plan Documents and any other documents executed by the Reorganized Debtor in connection with confirmation of the Plan and the occurrence of the Effective Date and delivered to the respective affected Creditors. All such obligations of the Reorganized Debtor will be evidenced by the Plan and such executed and delivered Plan Documents and the Trust. Unless otherwise provided therein, such documents will be governed by and construed in accordance with California law.

///

## X.    POST-EFFECTIVE DATE EVENTS AND PERFORMANCE BY THE REORGANIZED DEBTOR

The funds necessary to ensure continuing performance under the Plan after the Effective Date will be (or may be) obtained from:

1.    The Trust Assets, including the $14.25 million to be transferred to the Trust and the proceeds of the Unknown Tort Claims Fund Note;

2.    Liquidation or financing any Retained Assets;

3.    Cash generated by the post-Effective Date operations of the Reorganized Debtor; and

4.    Any reserves established by the Debtor or Reorganized Debtor; provided, however, that no part of the Trust may be used to pay creditors other than Tort Claimants, Unknown Tort Claimants, and Trust administrative expenses under the Plan, and only those Assets to be paid or contributed to the Trust, pursuant to the Plan, will be used to pay the Allowed Claims of Tort Claimants and Unknown Tort Claimants and Trust administrative expenses.

The Committee will be dissolved upon the occurrence of the Effective Date; provided, however, that Committee may continue to exist after the Effective Date with respect to any and all applications for Professional Fee Claims but not for any other purpose.

Upon the occurrence of the Effective Date, the Future Claims Representative will be released from his respective duties and discharged.

Subject to Sections 25.1 and 29.1 of the Plan and without altering or diminishing any other obligations of the Debtor or Reorganized Debtor under the Plan, following the Confirmation Date, the Debtor or Reorganized Debtor will:

1.    From the Effective Date, in the exercise of its business judgment, review or complete the review of all Claims filed against the Estate except for Tort Claims and, if advisable, object to such Claims;

2.    From the Effective Date, not itself object to any Tort Claims; provided that, notwithstanding the foregoing, the Reorganized Debtor may provide the Abuse Claims Reviewer or Trustee with information regarding Tort Claims;

3.      From the Effective Date, honor the Debtor's obligations arising under the Participating Party Agreement, Insurance Settlement Agreement and any other agreement that has been approved by the Bankruptcy Court as part of the Plan;

4.      Transfer the Unknown Tort Claims Fund Note to the Trust in accordance with Section 22.2 of the Plan;

5.      Transfer $14,250,000.00 from the Plan Implementation Account to the Trustee in accordance with Section 22.2 of the Plan; and

6.      Perform all of its obligations under the Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

No professional fees or expenses incurred by a claimant will be paid by the Reorganized Debtor, the Protected Parties, the Trust, or the Trustee with respect to any Claim except as specified in the Plan or the Trust Documents.

As soon as practicable after the Effective Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Reorganization Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Reorganization Case shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, the Trustee, or any other party in interest to reopen the Reorganization Case for any matter over which the Bankruptcy Court or the District Court has retained jurisdiction under the Plan.  Notwithstanding any order closing the Reorganization Case, the Bankruptcy Court or the District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in the Reorganization Case, and the obligations created by the Plan and the Plan Documents; (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents; and (c) provide that the Trust may be terminated and the Trustee discharged as ordered by the Bankruptcy Court without reopening the Reorganization Case.

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor shall retain and exclusively enforce the Retained Claims, whether arising before or after

the Petition Date, in any court or other tribunal, including, without limitation, a bankruptcy court adversary proceeding filed in this Reorganization Case. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Retained Claims, without obtaining Bankruptcy Court approval.

Except as otherwise provided in the Plan or the Confirmation Order, all Claims and defenses of any nature of the Debtor, Reorganized Debtor and Trustee are explicitly reserved and protected. The failure of any of the Debtor, Reorganized Debtor or Trustee to assert any such Claim or defense at any time shall not constitute the waiver, abandonment or other relinquishment of such claim or defense. Notwithstanding the foregoing, nothing in Section 27.2 of the Plan shall authorize or preserve any Claim, setoff, right of recoupment, or defense by any Entity against any of the Settling Insurers or in any way operate to impair or diminish, or have the effect of impairing or diminishing, the Settling Insurers' legal, equitable or contractual rights, if any, in any respect.

Except as expressly provided otherwise in the Plan, any Entity to whom the Debtor has incurred an obligation (whether on account of the provision of goods, services or otherwise), or who has received goods or services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of Claim against the Debtor in this Reorganization Case; (ii) such Entity's proof of Claim has been objected to; (iii) such Entity's Claim was included in the Schedules; or (iv) such Entity's scheduled Claims have been objected to or have been identified as disputed, Contingent, or unliquidated.

## XI.  REORGANIZATION OF THE DEBTOR AND POST-CONFIRMATION MANAGEMENT

A.    The Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all powers of a corporation sole under the laws of the State of

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

California and without prejudice to any right to alter or terminate such existence under applicable state law. Except as otherwise provided in the Plan or any documents executed in conjunction with the Plan, on and after the Effective Date, all property of the Estate and any property acquired by the Debtor or the Reorganized Debtor under the Plan, including, but not limited to all Revested Assets, will vest in the Reorganized Debtor free and clear of all Claims, liens, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtor may operate its business and carry on its ministry and its mission and may use, acquire, or dispose of property, and compromise or settle any Claims without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

B.      From and after the Effective Date, the Reorganized Debtor will continue to be managed in accordance with applicable state law, the Bishop will be the sole director of the Reorganized Debtor, and the Reorganized Debtor may continue to be managed also in accordance with the principles of Canon Law.

C.      The Committee has designated the Honorable William L. Bettinelli as the person who shall serve as the Abuse Claims Reviewer. The Abuse Claims Reviewer's *curriculum vitae* will be filed with the Court, along with a proposal from the Abuse Claims Reviewer with respect to his service as the Abuse Claims Reviewer, including the proposed Allocation Protocols and proposed fees with respect to his service as the Abuse Claims Reviewer.

D.      The Committee has designated OMNI Management Acquisition Corp. to serve as the Trustee. The Trustee's *curriculum vitae* will be filed with the Court, along with a copy of the rate schedule or other fee agreement that will apply to his service as the Trustee.

## XII.   LIQUIDATION OF TORT CLAIMS AND UNKNOWN TORT CLAIMS

A.      The Trust shall pay Tort Claims in accordance with the terms of the Plan, Confirmation Order, Plan Documents and Trust Documents.

B.      The amount of the Trust's distributions/reserves on account of the Tort Claims shall not be binding upon any Non-Settling Insurer or any Co-Defendant in connection with a Co-Defendant's liquidation of any contribution or indemnity claim.

C.      Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estate, the Reorganized Debtor, or any Protected Party relating to the treatment of Tort Claims or (ii) otherwise modify the rights or obligations of the Estate, the Reorganized Debtor, or any Protected Party as otherwise set forth in the Insurance Settlement Agreement, the Participating Party Agreement, the Plan or a Plan Document.

D.      Because Tort Claims are being paid by the Trust without regard to whether those Claims are covered by Insurance Policies issued by Settling Insurers or owed by Participating Parties: (a) the Trust shall be deemed to be subrogated to the Claims of the Tort Claimants paid by the Trust to the extent of those payments and (b) the Trust may pursue such subrogation Claim and any Contribution Claim except to the extent such Claim is against the Reorganized Debtor or any Protected Party. The Trust may not bring any action against the Reorganized Debtor, any Protected Party, and/or their respective Assets; provided, however, that the Trust may bring an action against any of the foregoing Entities or Assets to enforce the Plan, Trust Agreement, or other Plan Documents.

E.      If a Tort Claim is denied payment pursuant to the respective Tort Claims Allocation Protocol or Unknown Tort Claims Allocation Protocol, the holder of such Tort Claim will have no further rights against the Debtor, Reorganized Debtor, Participating Parties, Settling Insurers, the Trust or Trustee relating to such Tort Claim and such Tort Claim shall be a Disallowed Claim, subject to all provisions of Section 26.2 and Article 30 of the Plan.

## XIII.    INSURANCE MATTERS

### A.      <u>Settlement with Non-Settling Insurers</u>

Following the Effective Date, the Reorganized Debtor shall not enter into a settlement agreement affecting any Insurance Policy with any Non-Settling Insurer solely with respect to any Insurance Coverage for Tort Claims without the express written consent of the Trustee, which consent may be granted or withheld at the Trustee's sole and absolute discretion. Following the Effective Date, the Reorganized Debtor authorizes the Trustee to exclusively act on its behalf to negotiate a settlement with any Non-Settling Insurer on account of such Insurance Claims for Tort Claims. Such settlements may provide for the Non-Settling Insurer to become a Settling

Insurer.

**B.     <u>Insurance Neutrality</u>**

1.     Nothing in the Plan, the Confirmation Order or in any Plan Document modifies any of the terms of: (i) any Non-Settling Insurer's Insurance Policies or (ii) those Insurance Policies issued by a Settling Insurer except as set forth in the Insurance Settlement Agreement.

2.     Subject only to Article 30 and Sections 26.1 and 26.3 of the Plan and the Insurance Settlement Agreement, nothing in the Plan, the Confirmation Order or any Plan Document shall impair or diminish any Insurer's legal, equitable or contractual rights or obligations relating to the Insurance Policies, or the Insurance Claims against the Non-Settling Insurers in any respect.

3.     Except as otherwise provided in the Insurance Settlement Agreement or the Plan, the fact that the Trust is liquidating and paying or reserving monies on account of the Tort Claims shall not be construed in any way to diminish any obligation of any Non-Settling Insurer under any Insurance Policy to provide Insurance Coverage to the Debtor, the Debtor's Estate or the Reorganized Debtor for Tort Claims.  The rights, duties and obligations, if any, of Insurers under each Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by the discharge granted to the Debtor under the Plan pursuant to Bankruptcy Code § 1141(d).

4.     Neither the Trust's payment or reservation of monies on account of the Tort Claims nor the Abuse Claims Reviewer's review of a Tort Claim shall: (1) constitute a trial, an adjudication on the merits or evidence of liability or damages in any litigation with Non-Settling Insurers or (2) constitute, or be deemed, a determination of the reasonableness of the amount of any Tort Claim, either individually or in the aggregate with other Tort Claims, in any litigation of Insurance Claims with any Non-Settling Insurers.

5.     Notwithstanding any other provision in the Plan, the Confirmation Order or any Plan Document, the transfer of rights or the appointment of the Trustee as a representative to enforce Insurance Claims as to any Non-Settling Insurers with respect to Tort Claims, as the case may be, shall not be asserted as a defense to coverage under any Non-Settling Insurer's Insurance

Policy.

6.      Subject to Sections 26.3, 30.5 and 30.6 of the Plan, no provision of the Plan, the Confirmation Order or any Plan Document shall diminish or impair the rights of any Non-Settling Insurer under its Insurance Policy or the rights of a Non-Settling Insurer to assert any defense to any Insurance Claim.  Except as set forth in the Insurance Settlement Agreement, no provision of the Plan, the Confirmation Order or any Plan Document shall diminish or impair the rights of any Settling Insurer under those Insurance Policies issued by a Settling Insurer with respect to the Debtor or the rights of a Settling Insurer to assert any defense to any Insurance Claim under those Insurance Policies issued by a Settling Insurer with respect to the Debtor.

7.      A Non-Settling Insurer's obligations, with respect to any Tort Claim, shall be determined by and in accordance with the terms of the Insurance Policies and with applicable non-bankruptcy law.

8.      Nothing in the Plan, Confirmation Order or any Plan Document shall impose any obligation on any Participating Party or any Insurer to provide a defense for, settle, or pay any judgment with respect to, any Claim.

9.      Nothing in the Plan, Confirmation Order or any Plan Document shall grant to any Entity any right to sue any Insurer directly, in connection with any Claim or any Insurance Policy (including a Released Insurance Policy).  To the extent that an Insurance Policy continues in effect after the Effective Date, the terms of the Insurance Policy, the Insurance Settlement Agreement, and applicable non-bankruptcy law will govern the rights and obligations of such Entity; provided, however, that pursuant to the Plan and the Insurance Settlement Agreement, no Entity shall have any right to sue any Settling Insurer, directly or indirectly, in connection with a Channeled Claim or Tort Claim Interest.

10.     Nothing in the Plan, Confirmation Order, or in any Plan Document shall constitute a finding or determination that the Debtor and/or third party is a named insured, additional insured or insured in any other way under any Insurance Policy; or that any Insurer has any defense or indemnity obligation with respect to any Claim.  Subject to Section 26.3 of the Plan, no defense, denial or position of an Insurer shall be impaired or prejudiced in any insurance

coverage dispute.

11.     Nothing in Section 26.2 of the Plan negates or undoes the voluntary alteration of an Insurer's rights should it elect to become a "Settling Insurer" under the Plan.

12.     Nothing in the Plan is intended to affect the governing law of any Insurance Policy.

13.     As to matters between the parties to, and any third party beneficiaries of, the Insurance Settlement Agreement, (1) nothing in the Plan shall diminish the rights, or increase the obligations or burdens of any Settling Insurer under the Insurance Settlement Agreement and (2) to the extent the Plan affords less protection or benefits, or imposes different or greater obligations upon the Settling Insurers than the Insurance Settlement Agreement, the Insurance Settlement Agreement shall control.

C.     **Judgment Reduction**

In connection with any action by the Trust to enforce Insurance Claims with respect to an Insurance Policy issued by a Non-Settling Insurer, in the event that any Non-Settling Insurer obtains a judicial determination or binding arbitration award that, but for Article 30 of the Plan, it would be entitled to obtain a sum certain from a Settling Insurer or Participating Party as a result of a Contribution Claim, or a Claim for subrogation, indemnification, or other similar Claim against a Settling Insurer or Participating Party for such Settling Insurer's or Participating Party's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settling Insurer or Participating Party for any Claims released or resolved pursuant to any settlement agreement with a Settling Insurer or Participating Party, the Debtor or Trustee, as applicable, shall be deemed to have reduced its judgment or Claim against such other Non-Settling Insurer (or shall be deemed to have reduced its settlement with such other Non-Settling Insurer if such settlement does not address this matter) to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against such Settling Insurer or Participating Party.  To ensure that such a reduction is accomplished, and in addition to invoking the protection afforded it under Article 30 of the Plan in the Bankruptcy Court, such Settling Insurer or Participating Party shall be entitled to assert Section 26.3 of the Plan as a

defense to any action against it brought by any other Non-Settling Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settling Insurer or Participating Party and the other Protected Parties pursuant to a settlement agreement with a Settling Insurer or Participating Party from any liability for the judgment or Claim (except such order may not provide for any reduction, or require a return, of the Unknown Tort Claims Fund Note, the Tort Claim Settlement Amount, the proceeds of either as held by the Trust, or any distribution from the Trust or under the Plan to creditors other than Diocese Parties). Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settling Insurer or Participating Party, such Claim may be asserted as a defense against the Trust or Debtor in any litigation of Insurance Claims (and the Trust, the Debtor or Reorganized Debtor may assert the legal and equitable rights of such Settling Insurer or Participating Party in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Trust, the Debtor or other Participating Party shall be reduced dollar for dollar by the amount so determined. The Debtor and the Trust further agree that, in order to effectuate this clause in any action against a Non-Settling Insurer where the Settling Insurers or Participating Parties are not parties, the Debtor, the Reorganized Debtor or the Trust, as applicable, shall obtain a finding from that court of what amount the Settling Insurers or Participating Parties would have been required to pay such Non-Settling Insurer under its Contribution Claim if not for the operation of either of the Injunctions, before entry of judgment against such Non-Settling Insurer. The Bankruptcy Court shall retain non-exclusive jurisdiction to determine the amount, if any, of any judgment reduction pursuant to the terms of Section 26.3 of the Plan. In addition, any court of competent jurisdiction may determine the amount, if any, of any judgment reduction pursuant to the terms of Section 26.3 of the Plan.

Notwithstanding any other provision of the Plan, Sections 26.2 and 26.3 of the Plan shall not (i) affect or be construed to restrict or limit the scope or application of the Supplemental Injunction or (ii) alter, impair, or diminish any of the protections afforded to Settling Insurers or

Participating Parties under the Plan and Confirmation Order, the Insurance Settlement Agreement, the Participating Party Agreement, or the orders approving such settlement agreements.

## XIV. TREATMENT OF EXECUTORY CONTRACTS

In accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, all Executory Contracts of the Debtor will be assumed on the Effective Date (other than those Executory Contracts that already have been rejected by order of the Bankruptcy Court, are subject to a motion to reject Executory Contracts that is pending on the Confirmation Date, or are subject to a motion to reject an Executory Contract pursuant to which the requested effective date of such rejection is after the Effective Date). To the extent that Insurance Policies of the Debtor are or can be construed as executory, they will be assumed as modified by the Insurance Settlement Agreement. Each Executory Contract assumed pursuant to Article 24 of the Plan will revest in, and be fully enforceable by, the Reorganized Debtor in accordance with its terms.

With respect to obligations of the Debtor to indemnify any individual serving at any time on or prior to the Effective Date as one of its officers, employees, council members or volunteers by reason of such individual's service in such capacity to the extent provided in any of the Debtor's constituent documents, by a written agreement with the Debtor or under the laws of the State of California, as applicable, pertaining to the Debtor, will be deemed and treated as Executory Contracts that are assumed by the Reorganized Debtor pursuant to the Plan and Bankruptcy Code § 365 as of the Effective Date. Accordingly, such indemnification obligations of the Debtor to indemnify any Entity will survive unimpaired and unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date unless such individual is a Protected Party.

Every Claim asserted by a Creditor arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Effective Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection, if such Final Order is entered after the Effective Date. Every such Claim which is timely filed, as and when it becomes

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

an Allowed Claim, will be treated under Class 6 of the Plan. Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

## XV.  EFFECT OF CONFIRMATION

### D.  <u>Discharge</u>

As of the Effective Date:

1.  The provisions of the Plan will bind the Reorganized Debtor, any Entity acquiring property under the Plan, and any holder of a Claim; and

2.  The performance by the Debtor and Reorganized Debtor under any written agreement made by the Debtor as part of the Plan, including the Insurance Settlement Agreement, the Participating Party Agreement and Trust Documents, before the Effective Date will not be excused and shall survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtor and every other party to such agreement.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date the Debtor and the Reorganized Debtor will be discharged from and their liability will be extinguished completely in respect of any Claim and debt, whether reduced to judgment or not, liquidated or unliquidated, Contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Confirmation Date, or from any conduct of the Debtor prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest, if any, on any such Claims and debts, whether such interest accrued before or after the Petition Date, and including, without limitation, all Claims and debts relating to Tort Claims and Unknown Tort Claims and from any liability of the kind specified in Bankruptcy Code §§ 502(g), 502(h), and 502(i), whether or not a proof of Claim is filed or is deemed filed under Bankruptcy Code § 501, such Claim is Allowed under Bankruptcy Code § 502, or the holder of such Claim has accepted the Plan.

For purposes of clarity, the Debtor and the Reorganized Debtor shall be discharged from and their liability shall be extinguished completely as to any Tort Claim that was barred by the applicable statute of limitations as of the Bar Date but may be no longer barred by the applicable statute of limitations in the future for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claims.

**E.      Vesting**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date the Reorganized Debtor will be vested with all of the Revested Assets free and clear of all Claims, liens, encumbrances, charges and other Interests of Creditors, and the Reorganized Debtor will, thereafter, hold, use, dispose or otherwise deal with such property, operate its business, and conduct its ministry and mission without notice to any Entity, without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code or by the Court. All Retained Claims are hereby preserved for the benefit of the Reorganized Debtor. The prosecution and settlement of Retained Claims retained by the Reorganized Debtor will be the exclusive responsibility of the Reorganized Debtor; the Reorganized Debtor will have sole and absolute discretion over whether to prosecute or settle such causes of action. Any Claims, causes of action or demands transferred to the Trust are preserved for the benefit of the Trustee under the Trust.

**F.      Exculpation and Limitation of Liability**

**Except as expressly provided in the Plan, none of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any Claimant, any other party in interest, or any of their respective Representatives, financial advisors, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan or the Trust created under the Plan, except liability for their willful misconduct or gross negligence (provided, however, the Debtor and Reorganized Debtor, to**

the extent set forth in section 30.1 of the Plan, will be discharged from any such liability for such acts or omissions occurring prior to the Confirmation Date) and in all respects, such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Reorganization Case. Without limiting the generality of the foregoing, the Debtor and its members, financial advisors and other professionals shall be entitled to and granted the benefits of Bankruptcy Code § 1125(e).

**G.**     **Limitation of Liability**

The Protected Parties and the Reorganized Debtor and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental entity or insurer, on account of payments made to a Tort Claimant, including any liability under the MSPA.

**H.**     **Channeling Injunction**

In consideration of the undertakings of the Protected Parties pursuant to their respective settlements with the Debtor, the funding of the Trust, and other consideration, and to further preserve and promote the agreements between and among the Protected Parties and the protections afforded the Protected Parties and pursuant to Bankruptcy Code § 105:

**1.**     Any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan, the Allocation Protocols and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims; and

**2.**     All Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any of the Protected Parties, including:

**a.**     commencing or continuing in any manner any action or other

proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or against the property of any of the Protected Parties;

        **b.**     enforcing, attaching, collecting or recovering, by any manner or means, from any of the Protected Parties, or from the property of any of the Protected Parties, with respect to any such Channeled Claim, any judgment, Award, decree, or order against any of the Protected Parties;

        **c.**     creating, perfecting or enforcing any lien of any kind against any Protected Parties, or the property of any of the Protected Parties with respect to any such Channeled Claim;

        **d.**     asserting, implementing or effectuating any Channeled Claim of any kind against:

            **(i)**     any obligation due any of the Protected Parties;

            **(ii)**     any Protected Party; or

            **(iii)**     the property of any Protected Party;

        **e.**     taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and

        **f.**     asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties or the property of any of the Protected Parties.

        **3.**     For purposes of clarity, the Protected Parties shall not be liable for any Tort Claim that was barred by the applicable statute of limitations as of the Bar Date but is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claims and all such claims shall be considered Channeled Claims subject to the Channeling Injunction.

    **I.**     <u>**Supplemental Injunction Preventing Prosecution of Claims Against Settling Insurers and Insured Entities**</u>

         Pursuant to Bankruptcy Code §§ 105(a) and 363 and in consideration of the

undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreement, including any of the Settling Insurers' purchases of Released Insurance Policies from the Diocese Parties free and clear of all Tort Claim Interests pursuant to Bankruptcy Code § 363(f), any and all Entities who have held, now hold or who may in the future hold any Tort Claim Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, perpetrators, Non-Settling Insurers, trade and other creditors, Tort Claimants, Unknown Tort Claimants, and all others holding Tort Claim Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreement) against any of the Settling Insurers, the Insured Entities or the Released Insurance Policies are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Tort Claim Interests against the Settling Insurers, the Insured Entities, and/or the Released Insurance Policies, including:

      1.      Commencing or continuing in any manner any action or other proceeding of any kind with respect to any Tort Claim Interest against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

      2.      Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, Award, decree or order relating to Tort Claim Interests against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

      3.      Creating, perfecting, or enforcing any lien of any kind relating to Tort Claim Interests against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

      4.      Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind relating to Tort Claim Interests against any obligation due the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities; and

      5.      Taking any act, in any manner, in any place whatsoever, against the

Settling Insurers, Insured Entities, the Released Insurance Policies or the property of the Settling Insurers or the Insured Entities that does not conform to, or comply with, the provisions of the Plan.

6.    For purposes of clarity, the Settling Insureds and Insured Entities shall not be liable for any Tort Claim that was barred by the applicable statute of limitations as of the Bar Date but is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claims and all such claims shall be subject to the Supplemental Injunction.

**J.    Terms of Injunctions or Stays and Confirmation of Settlements**

On the Effective Date, the Injunctions provided for in the Plan shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable.  All Injunctions and/or stays provided for in the Plan, the injunctive provisions of Bankruptcy Code §§ 105, 524 and 1141, and all Injunctions or stays protecting any Settling Insurer that has purchased all or a portion of its Insurance Policies in a Bankruptcy Code § 363 sale, are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.   The Insurance Settlement Agreement authorized by the Bankruptcy Court is hereby affirmed and any obligations of Debtor with respect to such Insurance Settlement Agreement are excepted from the Debtor's discharge and shall be assumed by the Reorganized Debtor and Trust, as applicable, on the Effective Date.

**K.    Limitation of Injunction and Discharge**

Notwithstanding any provision of the Plan, the foregoing Injunctions and discharge preventing prosecution of Tort Claims against Settling Insurers, Insured Entities, and/or Protected Parties provides absolutely no protection to any individual who personally committed an act of Abuse as defined in section 3.2(a) of the Plan causing a Tort Claim.

**L.    Retention of Jurisdiction**

After the Effective Date, the Bankruptcy Court will retain jurisdiction for the purposes

expressly set forth in Article 32 of the Plan, which generally relate to enforcement and implementation of the Plan, including without limitation, allowance or disallowance of Claims, matters relating to Tort Claims and Unknown Tort Claims so long as such jurisdiction is consistent with the terms of the Trust, approval of post-Effective Date agreements of Entities who may become Participating Parties or Settling Insurers, and other matters set forth in the Plan.

## XVI. FEDERAL TAX CONSEQUENCES

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR. THE FOLLOWING IS ONLY PROVIDED AS A GENERAL DISCUSSION OF POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT MEANT AS AN ANALYSIS OF HOW ANY PARTICULAR CREDITOR OR PARTY IN INTEREST MAY BE AFFECTED BY ANY TAX IMPLICATIONS OF THE PLAN.

Under the Internal Revenue Code of 1986, as amended (the "Code"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in the Reorganization Case.

### A. The Trust.

The Trust is intended to be classified as a "qualified settlement fund" ("QSF") within the meaning of Treasury Regulations enacted under the Internal Revenue Code at 26 U.S.C. § 468B(g). The Trust is intended to be classified as a QSF because:

1. The Trust is established pursuant to an order of, or is approved by, the United States, any state, territory, possession or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing

jurisdiction of that governmental authority;

2.  The Trust is established to resolve or satisfy one or more contested or uncontested claims that has resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to Abuse (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relate to:  a case under Title 11 of the United States Code, a receivership, foreclosure or similar proceeding in a Federal or State court, or a workout); and

3.  The Trust is a trust under applicable state law.

The primary tax consequences of the trust being characterized as a QSF are the following:

1.  The Trust must use a calendar taxable year and the accrual method of accounting.

2.  If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust.  Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

3.  The Trust takes a fair market value basis in property contributed to it by the Debtor.

4.  The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%).  The Debtor's funding of the Trust with Cash and other property is not reported by the Trust as taxable income.  However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.  The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

6.  The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15, or later if an extension is granted under applicable law).  The Trust also will be required to comply with a number of other administrative tax rules including filing informational returns (generally IRS Form 1099) when

approved payments are made to Claimants and, where applicable, certain withholding requirements.

### B.      Federal Income Tax Consequences to Holders of Claims.

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation. Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income. Distributions to Tort Claimants may or may not be taxable depending on whether the payment may be considered compensation for personal physical injuries.

The federal income tax consequences of a distribution to a claimant also may depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, it is possible that the receipt of the distribution may not result in additional income to the claimant but may, as discussed below, result in a loss. Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant may be required to include the amount of the distribution in income when received.

In general, a claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair

market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. It is possible that the income or loss may be a capital gain or loss if the Claim is a capital asset in the claimant's hands.

## XVII. MODIFICATION OF PLAN

The Debtor may modify the Plan, subject to the prior consent of the Committee and each Participating Party and Settling Insurer listed on Exhibits 3 and 5 of the Plan, respectively, as to any proposed modification affecting their rights, interests or obligations, from time to time in accordance with, and pursuant to, Bankruptcy Code § 1127. The Plan may be modified by the Debtor, subject to the prior consent of the Committee and each Participating Party and Settling Insurer listed on Exhibits 3 and 5 of the Plan, respectively, as to any proposed modification affecting their rights, interests or obligations, at any time before the Confirmation Date, provided that the Plan, as modified, meets the requirements of Bankruptcy Code §§ 1122 and 1123, the Insurance Settlement Agreement and Participating Party Agreement, and the Debtor has complied with Bankruptcy Code § 1125. Each holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not adversely change the treatment of the Claim of such holder. Each holder of a Claim that votes in favor of the Plan authorizes the Debtor to modify, at any time prior to the Effective Date and without the requirement of further solicitation, the treatment provided to the Class of Claims such Claims are classified in, provided that the Bankruptcy Court determines that such modification is not material.

From and after the Effective Date, the Trustee, the Reorganized Debtor, and the Protected

Parties shall be authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan, and Plan Documents without further order of the Bankruptcy Court. Additionally, the Trustee, the Reorganized Debtor, and the other Protected Parties listed on Exhibits 3 and 5 may jointly make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement, subject to Bankruptcy Court approval, provided that the amendment or modification does not materially and adversely change the treatment of any holder of a Claim without the prior written agreement of such holder. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented under the Plan, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class.

An order of the Bankruptcy Court approving any amendment or modification made pursuant to Article 31 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

## XVIII. SOLICITATION PROCEDURES

### A.     Form of Ballots

1.     Ballots for Class 12 Claims, Class 13 Claims, Class 14 Claims and Class 15 Claims include certain releases and certifications that are required to be executed before a Class 12 Claimant, Class 13 Claimant, Class 14 Claimant or Class 15 Claimant may receive funds from the Trust. Any Class 12 Ballot, Class 13 Ballot, Class 14 Ballot or Class 15 Ballot received after the voting deadline, while it may not be counted as a vote for or against the Plan, shall be effective as to the releases, certifications, and elections contained in such Ballot.

2.     Ballots for Class 6 General Unsecured Claims include an election to opt into the General Unsecured Convenience Class. A timely submitted Ballot will be counted in accordance with the procedures and limitations herein, regardless whether the holder of the Claim makes an election. Any Class 6 Ballot received after the voting deadline but before commencement of payment on the Claim to which the Ballot pertains, while it may not be

counted as a vote for or against the Plan, shall be effective as to the election contained in such Ballot.

**B.      Ballot Tabulation**

1.      Any Ballot that is otherwise properly completed, executed and timely returned to the Debtor's counsel but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, shall be deemed a vote to accept the Plan;

2.      If no votes to accept or reject the Plan are received with respect to a particular Class that is entitled to vote on the Plan, such Class shall be deemed to have voted to accept the Plan;

3.      If a creditor, or any Entity acting on behalf of a creditor under applicable law, casts more than one Ballot voting the same Claim before the voting deadline, the last dated, validly executed Ballot received before the voting deadline shall be deemed to reflect the voter's intent and thus to supersede any prior Ballots;

4.      Creditors must vote all of their Claims within a particular Class either to accept or reject the Plan, and may not split their votes within a particular Class and thus a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall be deemed to have voted to accept the Plan;

5.      The Entity signing the creditor's Proof of Claim may complete and sign the creditor's Ballot, except that creditors holding Class 12 Claims, Class 13 Claims, Class 14 Claims and Class 15 Claims are required to sign his or her own Ballot, except that a legal guardian, executor or other duly appointed legal representative or administrator may sign on behalf of the Tort Claimant if proof of legal standing to do so is provided; and

6.      Any Class 12 Ballot, Class 13 Ballot, Class 14 Ballot or Class 15 Ballot that indicates either acceptance or rejection of the Plan shall be counted as a vote to accept or reject the Plan regardless of whether the releases and certification portions of the Ballot are completed.

7.      The following Ballots shall not be counted or considered in determining

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

whether the Plan has been accepted or rejected:

a. any Ballot received after the voting deadline unless the Debtor shall have granted in writing an extension of the voting deadline with respect to such Ballot;

b. any Ballot that is illegible or contains insufficient information to identify the voter;

c. any Ballot cast by an Entity or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

d. any Ballot cast for a Claim scheduled in the amount of $0.00, or as unliquidated, Contingent, or disputed for which no Proof of Claim was timely filed;

e. any unsigned Ballot; and

f. any Ballot transmitted to counsel to the Debtor by facsimile, email or other electronic means unless the Debtor has previously authorized such means in writing.

8. The Debtor and the Committee shall be permitted to contact creditors in an attempt to cure the deficiencies specified herein.

9. Any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Bankruptcy Code § 1129(a)(8).

**C.    Submission of Ballots**

A pre-printed form of Ballot for each of the Classes entitled to vote on the Plan will be sent to all creditors along with a copy of this Disclosure Statement, approved by the Court, which will have a copy of the Plan attached as an exhibit.  Creditors should read the Ballot carefully. The Bankruptcy Court has approved the form of Ballot and it contains specific instructions as to the deadline for its submission and the place where it must be submitted.  If any creditor has any questions concerning voting procedures, it may contact:

///

///

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

Paul J. Pascuzzi
Felderstein Fitzgerald Willoughby & Pascuzzi LLP
400 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone: (916) 329-7400
Email: ppascuzzi@ffwplaw.com

## XIX. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A. <u>Confirmation Hearing</u>

Bankruptcy Code § 1128(a) provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan. Bankruptcy Code § 1128(b) provides that any party in interest may object to Confirmation of the Plan. **FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

### B. <u>Confirmation Standards</u>

Among the requirements for the Confirmation of the Plan are that the Plan is accepted by all impaired classes of Claims, or if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, is feasible, and is in the "best interests" of holders of Claims that are impaired under the Plan. The following requirements must be satisfied pursuant to Bankruptcy Code § 1129(a) before the Bankruptcy Court may confirm a plan of reorganization. The Debtor believes that the Plan fully complies with the statutory requirements for Confirmation of the Plan listed below. The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

The Plan has been proposed in good faith and not by any means forbidden by law.

1. Any payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the chapter 11 case, in connection with the Plan and incident to the

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

chapter 11 case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

2.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint Plan with the Debtor or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policies.

3.    The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such insider.

4.    With respect to each holder within an impaired class of Claims, each such holder (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

5.    With respect to each class of Claims, such class (a) has accepted the Plan, or (b) is unimpaired under the Plan.

6.    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

- with respect to a Claim of a kind specified in Bankruptcy Code §§ 507(a)(2) or 507(a)(3), on the Effective Date of the Plan, the holder of the Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim, unless otherwise agreed;

- with respect to a class of Claim of the kind specified in Bankruptcy Code §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), each holder of a Claim of such class will receive (a) if such class has accepted the Plan, deferred Cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (b) if such class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

- with respect to a priority tax claim of a kind specified in Bankruptcy Code § 507(a)(8), the holder of such Claim will receive on account of such Claim deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

Effective Date of the Plan, equal to the Allowed amount of such Claim.

7. If a class of Claims is impaired under the Plan, at least one class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

8. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

9. All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**C.    Best Interest of Creditors and Liquidation Analysis**

The "best interest" test of Bankruptcy Code § 1129(a)(7)(A)(ii) requires that a plan provide to each dissenting member of each impaired class a recovery that has a present value at least equal to the present value of the distribution that unsecured creditors would receive if the bankruptcy estate were liquidated under chapter 7 of the Bankruptcy Code.

The Debtor has included a hypothetical liquidation (attached as Exhibit C to this Disclosure Statement). The Debtor believes that in a hypothetical liquidation, all creditors will receive less than they will likely receive under the Plan. The Debtor's liquidation analysis excludes property that is not property of the Debtor's Estate. Specifically, funds held in trust for the Non-Debtor Catholic Entities are not included in the hypothetical liquidation. Likewise, property the RCB received through grants, gifts and other assets which are subject to restrictions imposed by the donor or the grantor of the grant are not included in the hypothetical liquidation. The Committee disagrees with the Debtor over whether the property excluded from the liquidation analysis is properly excluded, and the Plan settles that dispute.

Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1. The Plan incorporates the Allocation Protocols. There is likelihood that a Chapter 7 trustee will be unable to implement the Allocation Protocols or a similar process in the

absence of a confirmed Chapter 11 plan. As such, substantial resources of the Estate likely would be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

2.      A Chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtor, pursuant to Bankruptcy Code § 326. Any such payment would dilute the amount of funds available to pay creditors.

3.      The Settling Insurers and Participating Parties would not obtain the Channeling Injunction or Supplemental Injunction or releases provided under the Plan, and therefore would not make the substantial contributions they are making under the Plan.

### D.      **Feasibility**

The Bankruptcy Code requires, as a condition to the Plan's confirmation, that the Bankruptcy Court find that liquidation of the Debtor, or the need for further reorganization, is not likely to follow after confirmation. For the purpose of determining whether the Plan meets this requirement, the Reorganized Debtor's ability to meet its obligations under the Plan has been analyzed. The Debtor has prepared projections of the cash flow for the ministries and operations of the Debtor. The projections were prepared by management and are attached as Exhibit D to this Disclosure Statement. The Debtor reasonably believes that it will be able to fund the Plan on the Effective Date, and the Reorganized Debtor will be able to make all payments required pursuant to the Plan.

## XX.    ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, several different events could occur:

1.      The Debtor's bankruptcy case could be converted to a case under Chapter 7 (assuming the Debtor consents), in which case a Chapter 7 trustee would be elected or appointed to liquidate the Debtor's assets for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. In addition to the factors discussed above, the Debtor believes that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee for bankruptcy and professional advisors to such trustee and (2) the erosion in value of assets in the environment in

1   which such a liquidation would likely occur.  Accordingly, the Debtor has determined that

2   confirmation of the Plan will provide each holder of a Claim with a greater recovery than that

3   holder would receive pursuant to liquidation of the Debtor under Chapter 7.

4          2.     The Debtor, or perhaps another party in interest, could propose another

5   plan providing for different treatment of certain creditors.  With respect to an alternative

6   Chapter 11 plan, the Debtor has examined various other alternatives in connection with the

7   process involved in the formulation and development of the Plan, and the Debtor believes that the

8   Plan, as described herein, enables holders of Claims to realize the best recoveries under the

9   present circumstances.

10          3.     The Bankruptcy Court, after appropriate notice and hearing, could dismiss

11  the Debtor's bankruptcy case if the Debtor is unable to confirm an alternative plan in a reasonable

12  period of time.  Under this scenario, creditors of the Debtor would recover significantly less (and

13  perhaps nothing) than they will under the Debtor's Plan.  Without the protections, including the

14  Channeling Injunction, available under a confirmed Plan, the Settling Insurers and Participating

15  Parties have little or no incentive to provide funding for the Debtor to pay creditors.  Absent the

16  contributions of the Settling Insurers and Participating Parties that are available only through a

17  confirmed Plan, the Debtor would not be able to contribute more than $16.65 million to the Plan.

18  Rather, the Debtor could, at most, contribute $6.31 million.  Dismissal is a poor alternative for

19  creditors.

20          Therefore, the Debtor strongly recommends that creditors vote to accept the Plan, as set

21  forth below.

22  **XXI.   RECOMMENDATION OF THE DEBTOR AND CONCLUSION**

23          This document has been presented for the purpose of enabling you to make an informed

24  judgment to accept or reject the Plan.  You are urged to read the Plan in full and consult with

25  counsel if you have questions.  The Debtor believes that acceptance of the Plan is in the best

26  interest of all creditors, and will provide the best recovery in this case.

27  ///

28  ///

DEBTOR'S DISCLOSURE STATEMENT
RE PLAN OF REORGANIZATION
DATED OCTOBER 26, 2016

1　　THE DEBTOR RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE

2　PLAN. THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE

3　RETURN TO CREDITORS UNDER THE CIRCUMSTANCES.

4　Dated: October 26, 2016

THE ROMAN CATHOLIC BISHOP
OF STOCKTON, a California corporation
sole

By: _____
Bishop Stephen E. Blaire
Responsible Person for the Debtor

8　FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP

10　By: _____
PAUL J. PASCUZZI
Attorneys for Debtor
and Debtor-In-Possession